BERNARD CORNFELD, Petitioner v COMMISSIONER OF INTERNAL REVENUE, Respondent
Cornfeld v. Commissioner
Docket No. 9530-77.
United States Tax Court
T.C. Memo 1984-105; 1984 Tax Ct. Memo LEXIS 569; 47 T.C.M. (CCH) 1213; T.C.M. (RIA) 84105; March 5, 1984. Burton W. Kanter,Marshall E. Eisenberg,Charles H. Winkler, and Harold J. Lipsitz, for the petitioner. James F. Kidd and William E. Bogner, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION
*570 COHEN, Judge: Respondent determined the following deficiencies in and additions to petitioner's income taxes: Additions to Tax
Year
Deficiencies
Sec. 6653(a) [1]
1964
$13,922.69
$696.00
1967
2,437.28
122.00
1968
271,491.00
13,578.00
1969
2,665,157.00
133,258.00
1970
268,770.00
13,439.00
After settlement of several issues by the parties, the issues remaining for determination are: 1. Whether expense deductions taken in 1969 and 1970 attributable to a BAC 1-11 jet aircraft were incurred by petitioner in connection with an activity not engaged in for profit within the meaning of section 183; 2. If petitioner's activities with respect to the BAC 1-11 were engaged in for profit, was the aircraft actually placed in service during the years in issue; and 3. Whether respondent bears the burden of proof with respect to the "placed in service" issue. FINDINGS OF FACT This case was stipulated in part, and the stipulations of facts and exhibits attached thereto are hereby incorporated *571 by reference. Hearsay objections set forth in the stipulation, as to which ruling was reserved by consent of the parties, are hereby sustained. Petitioner resided in Paris, France, when his petition herein was filed. In 1969, petitioner was principal shareholder, president, and chairman of the board of directors of Investors Overseas Services, Ltd. (S.A.) (IOS), a company he incorporated in 1955 to sell mutual funds and mutual fund investment programs in Europe. From its inception, IOS grew from a one-man company operating out of a one-room Paris apartment to a financial conglomerate managing more than $2.5 billion in assets and employing 25,000 sales representatives in offices in 100 countries. Total operating profits for IOS for the years 1967, 1968, and 1969 were $7.3 million, $14.3 million, and $10.4 million, respectively. Petitioner's personal wealth was substantial as well. During the years in issue, he owned and lived in a villa constructed by Napoleon in the nineteenth century upon 3 acres of land on the edge of Lake Geneva, Geneva, Switzerland. Petitioner also owned a three-story house in London with a library, finished basement, and sauna; a castle in France *572 where he kept 12 race horses; a flat in Paris; and a second chateau in Switzerland. He drove a Masarati and owned 2 houseboats and 3 other boats. Petitioner's business and personal life required him to travel frequently, and petitioner and his colleagues often chartered aircraft to reach their destinations. To facilitate travel, in March 1968 petitioner bought a used 12-seat Jet Falcon, which cost just under $1 million. He also purchased a 25 percent interest in a recently incorporated leasing company, Aeroleasing, that had been organized by petitioner's friends to operate their aircraft. Each shareholder paid a monthly fee to Aeroleasing to cover his jet's maintenance and operating costs, and Aeroleasing hired pilots, advertised and organized the chartered use of the aircraft, and collected the charter fees. The fees were deposited in a special account from which any additional operating costs were paid; the balance of the account was then remitted to the owner of the aircraft. In November 1968, petitioner paid $100,000 for a used 28-seat Convair, which was a propeller plane and more economical to fly on short European trips than the Falcon Jet. In June 1969, petitioner bought *573 a Bell Jet Ranger helicopter for easier access to ski resorts, and in August 1969, he bought an 8-seat Jet Commander for $425,000. All of these aircraft were operated through Aeroleasing and were available for lease to the public, although they were used at least as often by petitioner and IOS as by the public. In September 1969, petitioner signed an agreement for the purchase of a used BAC 1-11 90-seat aircraft and spare parts from the British Aircraft Corporation Ltd. Because the aircraft was then under lease to Autair International Airways (Autair) through October 31, 1969, the parties agreed that petitioner would "take delivery" of the aircraft on September 15, 1969, and then immediately "return" it to the British Aircraft Corporation for Autair's use. The total purchase price for the BAC 1-11 and spare parts was 1,825,500 British pounds (approximately $4,563,750), which included a discount of 20,000 pounds to compensate petitioner for Autair's use of the jet. The agreement also provided that British Aircraft Corporation would modify the aircraft after it was returned by Autair. The changes requested by petitioner consisted primarily of the addition of another fuel tank *574 and the conversion of the interior from the high density 90-seat capacity to a more luxurious 47-seat "executive" configuration, which included upgrading the kitchen and adding bar facilities. Because of the remodeling of the jet, the total purchase price was increased to 2,052,000 British pounds (approximately $5,130,000). The agreed date for delivery of the finished aircraft was February 28, 1970. Petitioner was obligated to pay 10 percent of the purchase price upon the execution of the sales agreement. A separate credit agreement executed at the same time provided for petitioner to pay the remainder of the purchase price in 18 6-month installments beginning on August 15, 1970, with interest calculated at the rate of 5-1/2 percent per annum on the unpaid balance. One of petitioner's contemplated used for the BAC 1-11 was as part of charter vacation packages to be sold by IOS. The IOS subsidiary that conducted the real estate operations of IOS, Investors Development Corporation Limited (INDEVCO), had previously developed Playamar I, a very successful large condominium resort project on Spain's Costa del Sol, and in 1969 was constructing an adjacent resort, playamar II. Petitioner *575 believed that the availability of tour packages to Playamar I and II would increase vacation traffic to the Costa del Sol and thereby increase condominium sales. INDEVCO would be able to charter the BAC 1-11 at cost to carry vacationers from northern Europe to southern Spain, which could make the tour packages lucrative for INDEVCO because commercial flights to the Costa del Sol were sporadic. Sometime prior to the February 1970 delivery date for the BAC 1-11, Britich Aircraft Corporation notified petitioner that the modifications to the jet could not be completed before June 1970. In May 1970, petitioner was ousted from his position as president and chairman of the board of IOS. As a result, petitioner's plans for IOS- related use of the BAC 1-11 were terminated. Petitioner subsequently refused to accept delivery of the aircraft. On his 1969 tax return, petitioner reported $159,062 in wages; $89,337 in dividends; $69,030 in interest; and $9,201,228 in long-term capital gains, including $7,718,256 realized from the sale of IOS securities in September 1969. Petitioner reported losses, inter alia, of $3,635,057 from investments in oil and gas ventures and $28,092 from horse *576 breeding activities. From his aircraft leasing activities, petitioner reported gross rental income of $337,462 and total losses of $1,592,001, of which $580,332, consisting primarily of depreciation, was attributable to the BAC 1-11. Petitioner's reported adjusted gross income for 1969 was $14,816. On his 1970 return, petitioner reported $568 in wages, $129,621 in dividends, $68,634 in interest, and $1,284,899 in long-term capital gains from the sale of IOS securities. From his aircraft leasing activities, petitioner reported gains of $480,030 from the sale of the helicopter, the Jet Commander, and the Falcon and total expenses of $2,014,680, of which $1,037,252, consisting primarily of depreciation, was attributable to the BAC 1-11. Petitioner's reported adjusted gross income for 1970 was a loss of $141,963. The relevant portion of the statutory notice of deficiency issued by respondent states: "It is determined that the claimed losses from rental of airplanes for taxable years 1968, 1969 and 1970 were not incurred in a transaction entered into for profit, therefore, the claimed losses are not allowable." Because the claimed depreciation deductions were disallowed, respondent *577 determined that no gain from the sale of the aircraft in 1970 was realized. In his trial memorandum, respondent raised another issue, specifically, "[w]hether, even if petitioner were in the airplane rental business, any deductible expenses were incurred by petitioner in 1969 or 1970 prior to the time the aircraft was available for petitioner's use." ULTIMATE FINDING OF FACT Petitioner did not in 1969 or 1970 have an actual and honest profit objective with respect to the BAC 1-11 jet aircraft. OPINION Respondent contends that petitioner's activities with respect to the BAC 1-11 were activities "not engaged in for profit" within the meaning of section 183(a). Section 183(b) provides that if an individual's actibities are "not engaged in for profit" only those deductions allowable regardless of a profit objective (such as interest and taxes) may be taken. If, however, the individual realizes gross income from the conduct of the activity, he nay offset that income by his otherwise nondeductible expenses after first reducing the income by the deductions allowed irrespective of a profit *578 objective. [2]
The disputed deductions are allowable, therefore, only if petitioner entertained an actual and honest profit objective in connection with the acquisition of the BAC 1-11. Dreicer v. Commissioner,78 T.C. 642 (1982), affd. in an unpublished opinion 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer's expectation of profit need not be a reasonable one, but there must be a good faith objective of making a profit. Sec. 1.183-2(a), Income Tax Regs. *579 ; Allen v. Commissioner,72 T.C. 28, 33 (1979). The determination of whether the requisite objective exists is to be resolved on the basis of all the facts and circumstances. Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). The burden of proof is on petitioner, Golanty v. Commissioner,72 T.C. 411 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981), with greater weight given to objective facts than to petitioner's mere statement of intent. Sec. 1.183-2(a), Income Tax Regs.; Engdahl v. Commissioner,72 T.C. 659, 666 (1979). The regulations provide a list of factors relevant in determining whether a taxpayer has the requisite profit objective. No one factor is conclusive, and we do not reach our decision herein by merely counting the factors that support each party's position. Sec. 1.183-2(b), Income Tax Regs.; Dunn v. Commissioner,supra at 720. Certain factors are given more weight than others because they are more meaningfully applied to the evidence in this *580 case. The factors set forth in section 1.183-2(b), Income Tax Regs., are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, that is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Some of these elements, such as petitioner's wealth, are apparent from the facts in this case and require no further discussion. At the trial herein, petitioner stated frequently that he had the requisite profit objective in mind when he acquired the BAC 1-11. Petitioner failed, however, to present other evidence to corroborate his self-serving statements. For example, there is nothing in the *581 record to demonstrate that he made any effort whatsoever to exploit the BAC 1-11 through leasing or charter to the general public. Petitioner testified that there was sufficient European demand for private charters of a jet the size of the BAC 1-11 to warrant its acquisition, but his abandonment of the project so soon after his ouster from IOS strongly suggests that he actually believed he would have no use for the jet if he were not associated with IOS. INDEVCO may have been able to benefit from petitioner's acquisition of the aircraft because it could be used to market INDEVCO's product, but petitioner has not shown how he personally would have derived a profit from such use. The remodeling of the interior of the aircraft ordered by petitioner is inconsistent with a profit objective here. After being remodeled, the jet would have been able to transport only half as many passengers as before, thus making it less economical to use. In addition, petitioner obligated himself to pay substantial amounts of money for modifications that delayed the availability of the jet. The modifications certainly made the aircraft more luxurious, but there is no evidence that they enhanced the *582 prospect of profits. Similarly, petitioner failed to show that he devoted time and effort, even indirectly, to assuring the success of his charter operations or that he had personal expertise or consulted with experts in the charter industry. He testified only that he had experience acquiring aircraft and that he considered an alternative before contracting to purchase the BAC 1-11. His testimony explained personal preference for the characteristics of the craft but not commercial advantage. The aircraft itself is not the type of asset that would be likely to appreciate in value, and petitioner has not claimed otherwise. Although petitioner claimed that his business was aircraft leasing beyond the ownership of the plane in issue, he failed to show any actual or contemplated pattern of profit-making from the alleged business. Petitioner's history of income of loss with respect to the activity, albeit short, supports respondent's claim that the true purpose of the activity was to generate losses in order to shelter petitioner's substantial income, rather than petitioner's claim of profit objective. Petitioner's substantial losses in less than 2 years make unlikely the chance *583 that he could ever profit from the acquisition of the jet. "The goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years." Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). Although our conclusion that petitioner did not have the requisite profit objective to justify the deductions claimed with respect to the BAC 1-11 is determinative of all of the issues remaining in this case, we also conclude on the evidence that respondent proved that petitioner did not place the aircraft in service in 1969 or 1970. See Cooper v. Commissioner,542 F.2d 599 (2d Cir. 1976), affg. a Memorandum Opinion of the Court. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. Section 183, as enacted by section 213 of the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 571, is applicable to taxable years beginning after December 31, 1969 (section 213(d), 83 Stat. at 572). The tests set forth under section 183 for determination of profit objective are substantially the same tests used by the courts to determine profit objective for years prior to 1970, however. Benz v. Commissioner,63 T.C. 375, 382-383 (1974); see Bessenyey v. Commissioner,45 T.C. 261 (1965), affd. 379 F.2d 252↩ (2d Cir. 1967).