T.C. Memo. 2005-188

UNITED STATES TAX COURT

LEONARD RABINOWITZ AND M. CAROLE RABINOWITZ, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5595-02.                    Filed July 27, 2005.

<u>William M. Weintraub</u> and <u>Brian Wright</u>, for petitioners.

<u>Jack H. Klinghoffer</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, <u>Judge</u>:  Respondent determined deficiencies of
$257,242 for 1992, $774,708 for 1993, $1,409,667 for 1994 and
$150,837 for 1997 in petitioners' Federal income taxes.[1]  The
parties have settled all issues except whether petitioners
operated their jet charter activity for profit from 1993 through

_____

[1]All section references are to the Internal Revenue Code for
the relevant years unless otherwise indicated, and all Rule
references are to the Tax Court Rules of Practice and Procedure.

1997 (the relevant years).[2] We hold that petitioners operated their jet charter activity for profit during each of the relevant years.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated by this reference. Petitioner Leonard Rabinowitz (Mr. Rabinowitz) resided in Beverly Hills, California, and petitioner M. Carole Rabinowitz, also known as Carole Little (Ms. Little) resided in Los Angeles, California, at the time petitioners filed the petition in this case.

Petitioners

Mr. Rabinowitz began his sales career with a job at his father's company while still in high school selling paint, plastic, and tools to automotive repair shops. After high school, he continued working for his father's company and then

---

[2]The "relevant years" in this case include 1995 and 1996, which are not years for which respondent issued a notice of deficiency. To determine the correct tax liability for 1992 and 1993, however, the correct net operating loss carrybacks must be computed, which requires us to determine whether petitioners operated the jet charter activity for profit in 1995 and 1996. Sec. 6214(b) obligates us to consider facts for other years as may be necessary to redetermine the amount of the deficiencies for the deficiency years. Sec. 6214(b); Hill v. Commissioner, 95 T.C. 437, 439-440 (1990). Therefore, we consider whether petitioners operated the jet charter activity for profit in 1995 and 1996 solely to permit the parties to compute the correct net operating loss carrybacks for 1992 and 1993 pursuant to Rule 155. See sec. 6214(b); Hill v. Commissioner, supra at 439-440. Although respondent issued a notice of deficiency to petitioners for 1992, respondent did not assert in the notice of deficiency that petitioners did not operate the jet charter activity for profit in that year. We therefore do not consider whether the activity was operated for profit during 1992.

for another enterprise, selling similar items.  Later, he accepted a position selling women's apparel wholesale for a clothing manufacturer.  Mr. Rabinowitz developed his sales skills further in positions with several other women's apparel companies before accepting a sales and merchandising position with Jasper Brothers of California (Jasper Brothers).  At Jasper Brothers, Mr. Rabinowitz met Ms. Little, a designer at the company.

Ms. Little was always interested in fashion and hoped to make it a career.  After brief stints at junior college and studying English literature at UCLA, she began looking for fashion courses.  She began studying at LA Trade Tech in the early 1970s after discovering there were no design-specific institutions.  She originally intended to take just one course at LA Trade Tech but loved her fashion studies so much that she stayed for 2 years and graduated.  Ms. Little then accepted a position designing women's apparel at Jasper Brothers.  There, she met Mr. Rabinowitz, and they began a personal relationship.[3] Their personal and professional relationship would last over 30 years, dramatically change their lives, and alter the way in which women's apparel was designed and marketed.

---

[3]Petitioners married each other in late 1978 or early 1979 and divorced in 1995 or 1996 although the record does not reflect the exact date of either their marriage or divorce.  Petitioners have maintained their professional relationship and at the time of trial owned Studio CL, a women's apparel design and import firm.

Petitioners' Fashion Company

At Jasper Brothers, Mr. Rabinowitz saw Ms. Little's design talent and suggested they go into business together, so that Ms. Little could design under her own name.  Ms. Little was excited by the opportunity to design her own line and generally fascinated with fashion and the industry.  She accepted Mr. Rabinowitz's plan, although she admittedly did not know much about going into business at the time.  The couple started California Fashion Industries (CFI) in 1974.[4]

Petitioners positioned CFI in the higher end of the women's apparel market.  CFI designed women's apparel, arranged for its manufacture, and distributed the apparel to higher end department and specialty stores.  CFI had a unique angle on the market by targeting its apparel to the needs and preferences of the baby boomer woman.  This meant that Ms. Little's designs gradually evolved over the years so that the apparel would continue to be relevant to the baby boomer woman as she aged from her midtwenties to her thirties and forties and beyond.  This strategy of building a brand that customers knew and could trust generated considerable loyalty among CFI's customers in succeeding years.

While Ms. Little was responsible for the creative end of the business, creating both clothing designs and artwork, Mr. Rabinowitz put his sales and merchandising talents to use selling

---

[4]During the relevant years, CFI was an S corporation and petitioners owned a majority of its stock.

the apparel to higher end department stores.  This took a great deal of work in developing contacts and relationships with department store executives.  Mr. Rabinowitz made a tremendous effort in this respect.  He even learned to ski so that he could spend more face time with the chairman of CFI's largest department store customer, who had repeatedly invited Mr. Rabinowitz to join him on the ski slopes.  Mr. Rabinowitz thought that skiing with the chairman might be a good way to develop this important relationship.

Petitioners' Jet Charter Activity

By 1984, CFI had grown to $24 million in annual sales, and petitioners were looking for new ways to expand their business. Petitioners realized there was great potential in marketing to Middle America and not limiting their sales calls to the east and west coasts of the United States.  It was very difficult for Mr. Rabinowitz to make sales calls to companies located in the middle of the country, however, if he traveled on commercial airlines because of his numerous other responsibilities and time commitments in running CFI.  For example, commercial airline travel did not provide much flexibility in travel arrangements and often required Mr. Rabinowitz to stay overnight.  An overnight stay on the road was an extraordinary time commitment for a busy executive like Mr. Rabinowitz and not feasible on an ongoing basis.

Petitioners also had encountered difficulties transporting clothing samples and other items to trade shows and events across the country. Oftentimes, things got lost or were delayed, which caused petitioners to miss important opportunities to market their clothing line to potential buyers.

Mr. Rabinowitz was aware of the advantages of chartering private aircraft. He had chartered a private aircraft occasionally to attend board meetings for a public company in San Jose, California. Petitioners began to charter a jet owned by a third party to use in CFI's business when needed. Difficulties with the availability and reliability of those jets, however, caused petitioners to consider another solution.

Petitioners decided to buy a jet and offer it for charter. Petitioners thought they could make money in this activity, do it better than other aircraft charter companies, and at the same time provide a safe aircraft for CFI.

Petitioners purchased a Mitsubishi Diamond 1-A aircraft (the Mitsubishi) and started Beverly Hills Jet (BHJ), their jet charter activity, in 1985. Petitioners' business advisers had recommended that petitioners not cause CFI to purchase the aircraft to avoid having to list the jet on CFI's balance sheet. The goal was to ensure that the jet was not included in a computation of the ratio of CFI's available capital to fixed assets. Instead, petitioners purchased the Mitsubishi individually rather than through CFI.

The impact on CFI was immediate. By the early 1990s, CFI's sales had grown to a peak of over $300 million. Mr. Rabinowitz attributed a significant portion of the sales growth to CFI's use of chartered aircraft. Using a private jet enabled petitioners to visit department store buyers in cities that could not be reached via commercial airlines. In addition, petitioners were able to open a flagship Carole Little store in Aspen, Colorado, to showcase their brand and their products.[5] This store was one of only one or two that carried the full line of Carole Little merchandise. The store also served as a product testing ground, where CFI could test particular items before distributing them nationally. With the jet, they could quickly visit this store to check on or deliver merchandise, examine the store's appearance, and discuss any issues regarding sales of the clothing with the store staff. They learned what clothing sold and, more importantly, why certain clothing did not sell.

Also, the arrival of Mr. Rabinowitz on a private jet to make a sales call distinguished him from other salespeople in his buyers' eyes and allowed Mr. Rabinowitz to call on high-ranking executives to whom he would not otherwise have access. Ms. Little was able to make more personal appearances to market her brand. In addition, because she could bring garments on the jet with her and add finishing touches, Ms. Little could devote more time to creating new designs rather than waiting for commercial airlines. The jet also cut down on the risk of loss or delay of

_____

[5]Petitioners also had a second home in Aspen, Colorado.

Ms. Little's valuable original designs because petitioners could bring them on the jet. The garments never were out of their sight.

CFI became a very lucrative business for petitioners during the relevant years. Petitioners together earned wages from CFI of $840,000 to $5.5 million during each of the years in issue.

Modifications to the Jet Charter Activity

After a few years, petitioners became concerned that the Mitsubishi was not generating sufficient revenue. Petitioners analyzed both the cost side and the revenue side of their jet charter activity. On the cost side, petitioners noted that the Mitsubishi incurred high fixed costs that generally would not vary according to the size of the aircraft, such as a hangar, pilots, and other full-time employees. On the revenue side, petitioners recognized that the Mitsubishi did not generate many charters. The Mitsubishi was a smaller aircraft and had a limited range. It could travel from the coast only to about midcountry and then needed to be refueled. Although the time it took to refuel was minimal, charter customers preferred to travel nonstop and generally preferred to charter a jet that did not require refueling to travel across the country. Mr. Rabinowitz also believed that the Mitsubishi was not comfortable for passengers and understood the marketplace was generally interested in chartering larger aircraft. Therefore, petitioners were faced with high fixed costs to own and operate the Mitsubishi and low demand to charter such a small jet.

Petitioners explored the idea of purchasing a larger, longer range aircraft that they could charter for a higher fee per hour. In 1989, petitioners purchased a Dassault Falcon 200 jet (the Falcon) for $5.2 million. Petitioners paid part of the purchase price of the Falcon by trading in the Mitsubishi. Mr. Rabinowitz thought they were getting a good deal on the Falcon because the seller, US West Communications, was anxious to purchase a different aircraft.

Initial Management of the Jet Charter Activity

Petitioners initially engaged an outside management firm, Raleigh Enterprises, to manage the jet charter activity for the first 6 to 8 months. To maximize the charter business, petitioners obtained an operating certificate for aircraft chartered to the general public (a rule 135 certificate) pursuant to the requirements of the Federal Aviation Administration (FAA). Raleigh Enterprises assisted with the process of obtaining the rule 135 certificate and also maintained the jet, solicited charter business, and generally managed the aircraft. Mr. Rabinowitz decided to handle these matters himself within a year of purchasing the Mitsubishi.

Compliance With FAA Rules

Petitioners maintained a rule 135 certificate for their jet because they wanted to make it available for third-party charters. See 14 C.F.R. secs. 119.33, 135.1-135.443 (2005). The FAA requires a rule 135 certificate for an enterprise to charter an aircraft for profit. An enterprise that cannot charter its

aircraft for profit (such as, for example, a jet owned by an individual and used only by that individual and family) would obtain a certificate under FAA rule 91, and a scheduled airline would obtain a certificate under FAA rule 121.

The FAA requirements to maintain a rule 135 certificate are more onerous than the FAA requirements for aircraft that are not chartered to the general public. For example, the FAA requires pilots to be trained to certain standards and also requires higher maintenance standards than those specified for jets not operated with a rule 135 certificate. The FAA also requires both a maintenance manual and an operations manual to maintain a rule 135 certificate, and Federal excise tax must be charged on all flights. Mr. Rabinowitz estimated that it cost approximately several hundred thousand dollars per year to maintain a rule 135 certificate pursuant to the FAA standards, absent the excise tax.

Marketing of the Jet Charter Activity

Petitioners marketed their jet charter activity in several ways. Mr. Rabinowitz understood from the industry that the most likely charter customers were individuals or companies that themselves owned private aircraft but whose jets were unavailable to them for various reasons. Therefore, Mr. Rabinowitz contacted other aircraft owners to inform them that he had the Falcon and a rule 135 certificate, and that he would like their business. Mr. Rabinowitz also asked the chief pilot to solicit business by contacting other flight departments and pitching BHJ when he was not flying the Falcon. Mr. Rabinowitz paid the chief pilot a

commission on flights generated.  Mr. Rabinowitz developed a marketing campaign including brochures and flyers to solicit charter business.  Petitioners also advertised in The Air Charter Guide, a trade publication.

Setting the Charter Price

Mr. Rabinowitz carefully assessed the aircraft charter market to determine the price petitioners should charge for third-party charters of the Falcon.  He ascertained what other owners of similar jets charged and charged a similar rate, which was between $1,950 and $2,250 per hour.  Mr. Rabinowitz also ascertained rates other charter businesses charged for a large number of hours per year and decided to charge CFI a type of bulk discount of $1,800 per hour.  Prices in the industry stayed fairly stagnant during the relevant years.  Petitioners therefore did not change the price they charged CFI during this period.

Employees of the Jet Charter Activity

Petitioners hired several full-time employees for BHJ.  The employees included a chief pilot, a co-captain, and an FAA certified aircraft and power mechanic.  Also, two bookkeepers together worked approximately full time for BHJ from 1989, when petitioners acquired the Falcon.  Mr. Rabinowitz himself spent approximately 30 hours per week on his BHJ activities.  Mr. Rabinowitz assisted in preparing books and records, approving flight logs and generating invoices, managing the staff, payroll and compensation policies, engaging in marketing activities, serving as liaison with the FAA, and generally managing the

aircraft.  In addition, Mr. Rabinowitz also spent at least 50 hours per week on his work for CFI.

Personal Use of the Jet

Petitioners did use the Falcon for some personal travel, but not very often.  Each time petitioners used the Falcon for personal travel, BHJ billed them and they paid BHJ from their personal checking account.  Petitioners' accountants verified that an invoice was prepared for personal travel and Mr. Rabinowitz paid the invoices.  Petitioners' daughter, Jennifer Heft, who was a merchandising employee of CFI, also made trips in the Falcon to meet with Ms. Little concerning various CFI matters.  BHJ billed CFI, and CFI paid BHJ, for each of Ms. Heft's trips.

Arrangement With Verna Harrah

Verna Harrah (Ms. Harrah), a woman Mr. Rabinowitz was dating from 1990 through 1995 while he was separated from Ms. Little, and who was involved in a movie business with Mr. Rabinowitz, also owned a jet, which cost approximately four times as much as petitioners' jet.  Ms. Harrah's jet had nicer amenities and could fly to Europe and South America.  Petitioners agreed with Ms. Harrah that each would look to the other first when they needed to use an aircraft and their own aircraft was busy, and that the rate for the use of the other's aircraft would be the direct costs of operation only.  Direct costs of operation were those costs related to the flying time and included a specified amount for wear and tear on the aircraft, fuel, and engine maintenance.

Direct costs of operation did not include costs fixed and paid annually, such as insurance, the cost for the hangar, and the salaries of the pilots and mechanics. Petitioners therefore charged Ms. Harrah $1,200 per hour for the use of the Falcon based on the direct costs of operation, and Ms. Harrah charged petitioners approximately $1,300 to $1,400 per hour for the use of her jet based on the direct costs of operation.

Petitioners made sure, however, that Ms. Harrah's request for use of the Falcon had least priority such that, if a third-party charter customer or CFI had requested the use of the Falcon, Ms. Harrah would not be able to use it. Petitioners believed the arrangement was advantageous to them because the agreement enabled them to use a jet worth about four times as much as their own for only about $100 to $200 more per hour. Petitioners could use Ms. Harrah's jet for personal travel or could accommodate charter customers on Ms. Harrah's jet when the Falcon was not available.

Success of the Jet Charter Activity

Petitioners believed BHJ would be able to generate a profit if the jet had enough hours of flying and if the activity had the right mix of charters to CFI, charters to third parties, and charters to Ms. Harrah pursuant to their agreement.

CFI was treated like any other customer and did not have priority over using the Falcon. Petitioners noted that if a third-party customer wished to book the jet (which would be at a higher rate because of CFI's bulk discount), petitioners would

schedule CFI's trip around the third-party customer's trip.  In that event, CFI could also use Ms. Harrah's jet at the agreed rate.

Petitioners enjoyed moderate success obtaining third-party customers for BHJ.  John Paul Mitchell, Tom Hanks, Don Henley, Jean Claude Van Damme, and Kenny G all occasionally chartered the Falcon.  Petitioners also had several key customers who regularly booked travel on the Falcon.

Petitioners encountered some difficulties with the Falcon, however.  The U.S. Coast Guard had purchased approximately 80 percent of all the Dassault Falcon 200s sold in the United States and put them into service flying coastal missions at a low altitude and over the coastline.  The U.S. Coast Guard reported problems with the engine seals as well as engine shutdowns in the aircraft.  In response to these difficulties, the FAA required increased maintenance and service of the engines on all Dassault Falcon 200s, including the Falcon petitioners owned.  The negative publicity surrounding the engines impeded petitioners' charter sales and devalued petitioners' Falcon.

Petitioners considered selling the Falcon, but they decided to keep the Falcon and continue soliciting third-party charters because they were concerned that the negative publicity would depress the sale price.  Mr. Rabinowitz anticipated a greater return from chartering the aircraft in the meantime than from selling it at a depressed value.

Petitioners suffered a net loss for each year from 1985 through 1997 attributable to their jet charter activity. During the relevant years, BHJ had the following gross income, net loss and net cash flow:

| Year | Gross Income | Net Income (Loss) | Net Cash Flow |
|------|-------------|-------------------|---------------|
| 1993 | $580,340 | ($743,485) | ($547,984) |
| 1994 | 545,941 | (685,719) | (485,423) |
| 1995 | 447,524 | (775,618) | (574,585) |
| 1996 | 527,298 | (521,076) | (397,924) |
| 1997 | 273,704 | (214,126) | (208,938) |

Repairs and maintenance were the major expenses during the relevant years.

Mr. Rabinowitz was constantly trying to improve the jet charter activity and remained focused on increasing the bottom line of the combined entities. Although BHJ did not generate a profit, Mr. Rabinowitz was pleased with the jet charter activity because of the benefits to CFI. Mr. Rabinowitz continued trying to improve BHJ's operations as well.

Sale of CFI and Termination of the Jet Charter Activity

In April 1997, petitioners decided to sell the Falcon for $4.35 million and terminated their jet charter activity. Petitioners also decided to sell CFI. They ultimately sold it to a larger company in August 2000 in exchange for stock.

Deductions at Issue

Petitioners filed joint tax returns for each of the relevant years and deducted losses attributable to the jet charter

activity.  Respondent disallowed petitioners' losses relating to the jet charter activity for 1993, 1994, and 1997 in a notice of deficiency dated November 15, 2001, determining that, among other issues, petitioners did not engage in their jet charter activity for profit under section 183.  Petitioners timely filed a petition with this Court seeking redetermination of the disallowed losses and asserting that they engaged in the jet charter activity with the intent of making a profit.

OPINION

A.    Whether Petitioners Operated BHJ for Profit

We are asked to decide whether petitioners operated BHJ for profit during the relevant years within the meaning of section 183.  Section 183(a) provides generally that if an individual engages in an activity and "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Deductions that would be allowable without regard to whether the activity is engaged in for profit shall be allowed under section 183(b)(1), and deductions that would be allowable only if the activity is engaged in for profit shall be allowed under section 183(b)(2), but only to the extent that the gross income from the activity exceeds the deductions allowable under section 183(b)(1).

We follow the Court of Appeals opinion squarely on point when appeal from our decision would lie to that court absent stipulation by the parties to the contrary.  Golsen v.

Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Because petitioners reside in the Ninth Circuit, petitioners have the burden of proving that they conducted their activities with the primary, predominant or principal purpose of realizing an economic profit independent of tax savings. See Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), affg. T.C. Memo. 1991-212; Polakof v. Commissioner, 820 F.2d 321, 323 (9th Cir. 1987), affg. T.C. Memo. 1985-197; Indep. Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 726 (9th Cir. 1986), affg. Lahr v. Commissioner, T.C. Memo. 1984-472.

Petitioners do not contend that section 7491(a) applies in this case to shift the burden of proof to respondent, nor have they established they met the requirements of section 7491(a)(2).[6] Therefore, the burden of proof remains with petitioners.

Whether a taxpayer has the primary, predominant or principal purpose of realizing an economic profit independent of tax savings is determined on the basis of all surrounding facts and circumstances. Polakof v. Commissioner, supra at 324; Indep. Elec. Supply, Inc. v. Commissioner, supra at 727; Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(b), Income Tax Regs. While a taxpayer's expectation of profit need not be

_____

[6] Sec. 7491(a) shifts the burden of proof to the Commissioner in some circumstances for cases involving examinations that commenced after July 22, 1998. See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001, 112 Stat. 726.

reasonable, there must be a good faith objective of making a profit.  Allen v. Commissioner, 72 T.C. 28, 33 (1979); sec. 1.183-2(a), Income Tax Regs.  We give greater weight to objective facts than to a taxpayer's statements of intent.  Dreicer v. Commissioner, supra at 645; sec. 1.183-2(a), Income Tax Regs.

Before we address whether petitioners had the primary, predominant or principal purpose of realizing an economic profit independent of tax savings, we first must address whether CFI and BHJ may be treated as one activity.  Respondent argues that we may not aggregate the two activities to determine the profit objective.  We agree.

B.   Whether CFI and BHJ May Be Treated as One Activity for
     Purposes of Section 183

Multiple activities of a taxpayer may be treated as one activity if the activities are sufficiently interconnected.  Sec. 1.183-1(d)(1), Income Tax Regs.  In making this determination, the most important factors to be considered include the degree of organizational and economic interrelationship of the undertakings, the business purpose served by carrying on the undertakings separately or together, and the similarity of the undertakings.  Id.  The Commissioner generally accepts a taxpayer's characterization of two or more undertakings as one activity unless the characterization is artificial or unreasonable.  Id.

We have considered those and other factors in determining whether the taxpayer's characterization is unreasonable.  These include:  (a) Whether the undertakings share a close

organizational and economic relationship; (b) whether the undertakings are conducted at the same place; (c) whether the undertakings were part of a taxpayer's efforts to find sources of revenue from his or her land; (d) whether the undertakings were formed as separate businesses; (e) whether one undertaking benefited from the other; (f) whether the taxpayer used one undertaking to advertise the other; (g) the degree to which the undertakings shared management; (h) the degree to which one caretaker oversaw the assets of both undertakings; (i) whether the taxpayers used the same accountant for the undertakings; and (j) the degree to which the undertakings shared books and records.  See Keanini v. Commissioner, 94 T.C. 41, 46 (1990); Estate of Brockenbrough v. Commissioner, T.C. Memo. 1998-454.

We find that it is inappropriate to treat CFI and BHJ as one activity for purposes of applying section 183.  CFI and BHJ did not share a close organizational or economic relationship.  CFI was an S corporation, while BHJ was a sole proprietorship. Although the ownership of CFI and BHJ was the same and Mr. Rabinowitz managed both CFI and BHJ, there was no other organizational relationship between CFI and BHJ.  CFI and BHJ also did not have a close economic relationship.  CFI was a charter customer of BHJ, as were numerous other third parties.

CFI and BHJ also were not similar activities.  CFI was engaged in the design and distribution of women's apparel, while BHJ was a jet charter service.  Petitioners had a business purpose for treating CFI and BHJ as separate entities.

Petitioners were concerned about the presence of a jet on CFI's balance sheet. Petitioners ensured the activities were treated separately as long as they existed. Accordingly, petitioners caused BHJ to invoice CFI for, and CFI to pay for, each of CFI's charter flights on the Falcon.

After reviewing the above factors and the facts and circumstances of this case, we find it is inappropriate to treat BHJ and CFI as one activity for purposes of applying the section 183 rules. See Schlafer v. Commissioner, T.C. Memo. 1990-66; sec. 1.183-1(d)(1), Income Tax Regs. Accordingly, we shall examine whether petitioners engaged in the jet charter activity for profit without consideration of whether petitioners engaged in CFI for profit. See sec. 1.183-1(d)(1), Income Tax Regs.

C.  Whether Petitioners Engaged in BHJ for Profit

In determining whether petitioners engaged in the jet charter activity for profit, we structure our analysis around nine nonexclusive factors. Sec. 1.183-2(b), Income Tax Regs. The nine factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his or her advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer;

and (9) whether elements of personal pleasure or recreation are involved.  Id.

No factor or set of factors is controlling, nor is the existence of a majority of factors favoring or disfavoring a profit objective necessarily controlling.  Hendricks v. Commissioner, 32 F.3d 94, 98 (4th Cir. 1994), affg. T.C. Memo. 1993-396; Brannen v. Commissioner, 722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); sec. 1.183-2(b), Income Tax Regs.  The individual facts and circumstances of each case are the primary test.  Keanini v. Commissioner, supra; Allen v. Commissioner, supra at 34; sec. 1.183-2(b), Income Tax Regs.

Petitioners argue that, in determining whether they had a primary, predominant or principal purpose and intent of realizing an economic profit from the jet charter activity independent of tax savings, we should take into account the increased profitability of CFI due to using petitioners' jet charter service.  Petitioners have proved, however, that they operated the jet charter activity for profit independent of its effect on the profitability of CFI.  Therefore, we do not address this issue.

D.   Application of the Factors

    1.   The Manner in Which the Taxpayer Carried On the Activity

We begin by examining the manner in which petitioners carried on the jet charter activity.  The fact that a taxpayer carries on an activity in a businesslike manner may indicate a profit objective.  Sec. 1.183-2(b)(1), Income Tax Regs.  In

determining whether a taxpayer conducted an activity in a businesslike manner, we consider whether the taxpayer maintained complete and accurate books and records, whether the activity was conducted in a manner substantially similar to comparable businesses that are profitable, and whether changes were attempted to earn a profit. Engdahl v. Commissioner, 72 T.C. 659, 666-667 (1979); sec. 1.183-2(b)(1), Income Tax Regs.

Petitioners carried on the jet charter activity in a businesslike manner during the relevant years. Petitioners sought and obtained a rule 135 certificate from the FAA that enabled them to operate BHJ as a third-party charter service. The FAA required petitioners to keep a maintenance manual and an operations manual and also required higher maintenance and pilot training standards to maintain a rule 135 certificate. The FAA did not impose these requirements on enterprises not maintaining a rule 135 certificate. The FAA also required petitioners to charge a Federal excise tax on all flights. Petitioners kept complete and accurate books and records for the jet charter activity and employed two bookkeepers approximately full time in the aggregate on this activity during the relevant years.

Petitioners advertised the jet charter activity through various means. Mr. Rabinowitz solicited charter business from owners of other aircraft. Petitioners created flyers and advertisements (including an ad in The Air Charter Guide, a trade publication), and paid the chief pilot on commission to solicit charters.

Petitioners charged varying charter rates to different customers. Petitioners charged third parties a rate per hour consistent with the price to charter other, similar jets. Petitioners charged CFI a slightly lower rate, which was the market rate when a customer booked a large number of flight-hours per year. These competitive rates were based on an assessment of the rates others charged to charter similar jets.

Petitioners also entered into the arrangement with Ms. Harrah to accommodate each other on their respective jets if their own were unavailable. The arrangement with Ms. Harrah enabled petitioners to provide services to their third-party charter customers on a larger jet in the event the Falcon was unavailable and also to use a different jet for personal travel if the Falcon was reserved for paying customers. In the event petitioners used the Falcon for personal travel, BHJ invoiced petitioners for the travel and petitioners paid for it. These sums were included in BHJ's gross receipts.

Petitioners also made changes to the jet charter activity to try to make it profitable. Petitioners realized that the initial jet, the Mitsubishi, was not ideal for third-party charters. The Mitsubishi was not able to fly across the country without stopping to refuel and was uncomfortable for passengers. Petitioners decided to trade in the Mitsubishi for the Falcon, which did not have these drawbacks, in the hope that the Falcon would be more attractive to customers and increase petitioners' third-party charter business.

The rule 135 certificate and required documentation, books and records, arm's length rates charged to charter customers, extensive advertising, and the changes petitioners implemented all indicate that petitioners operated the jet charter activity in a businesslike manner and support petitioners' contention that they carried on the jet charter activity for profit.

2.   The Expertise of the Taxpayers or Their Advisers

We next consider petitioners' expertise (or the expertise of their advisers) in jet charter activities.  Preparing for the activity by extensive study of its accepted business, economic and scientific practices and consulting with experts in these matters may indicate that a taxpayer has a profit objective when the taxpayer follows that advice.  Sec. 1.183-2(b)(2), Income Tax Regs.

When petitioners began the jet charter activity, petitioners initially retained an outside management firm to manage the jet charter activity for the first 6 to 8 months until Mr. Rabinowitz had some experience in the business and could do it himself. Petitioners also hired several trained staff members to work for the jet charter activity throughout the time they were engaged in the activity, including a captain, a co-captain, a mechanic, and two bookkeepers.  Mr. Rabinowitz also took pains to ensure his decisions were educated decisions about the jet charter activity. For example, he personally solicited owners of other aircraft as charter customers because he had learned from the industry that these were often the best charter customers.

Both petitioners also have considerable business knowledge and skills not directly related to the jet charter industry. Petitioners built CFI into an organization that had hundreds of millions of dollars in sales at its peak. The skills required to build such a successful business undoubtedly assisted Mr. Rabinowitz in his work for the jet charter activity. In addition, although Mr. Rabinowitz may not initially have been familiar with the intricacies of the jet charter industry, he knew about marketing, employee relations and other essential tools necessary to run a business, all of which he put to use operating the jet charter activity.

In sum, petitioners hired skilled staff members to assist in operating the jet charter activity. Mr. Rabinowitz has also demonstrated that he has considerable business knowledge and undertook efforts to become familiar with industry practice. These facts support a conclusion that petitioners operated the jet charter activity for profit.

3. <u>The Time and Effort Expended by the Taxpayer in Carrying On the Activity</u>

We next consider the time and effort petitioners expended on the jet charter activity. A taxpayer's devotion of much time and effort to conducting an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit. Sec. 1.183-2(b)(3), Income Tax Regs. The fact that a taxpayer devotes a limited amount of time to an activity does not necessarily indicate a

lack of profit motive where the taxpayer employs competent and qualified persons to carry on the activity.  Id.

Mr. Rabinowitz spent approximately 30 hours per week on the jet charter activity during the relevant years.  This time was in addition to the approximately 50 hours per week Mr. Rabinowitz spent on CFI's business.  Mr. Rabinowitz was involved in every aspect of operating the jet charter business, from approving flight logs, generating and approving invoices, marketing the charter service, addressing employee and compensation matters, and generally managing the aircraft.  Petitioners also hired three full-time employees to work for the jet charter activity who included a chief pilot, a co-captain, and a mechanic.  The two bookkeepers also together spent approximately full time on the jet charter activity.

Taken together, Mr. Rabinowitz and BHJ's employees spent a considerable amount of time and effort on the jet charter activity during the relevant years.  That Mr. Rabinowitz spent so much time on the jet charter activity in addition to his considerable responsibilities for CFI indicates that he did not take the jet charter activity lightly.  He made a large effort on the jet charter activity in addition to his numerous responsibilities for CFI.  These facts support petitioners' contention that they operated the jet charter activity for profit.

4.    The Expectation That the Assets Used in the Activity
      May Appreciate in Value

We next examine the expectation that the assets used in the
jet charter activity may appreciate in value.  A taxpayer may
intend, despite the lack of profit from current operations, that
an overall profit will result when appreciation in the value of
assets used in the activity is realized.  Bessenyey v.
Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d
Cir. 1967); sec. 1.183-2(b)(4), Income Tax Regs.

Neither petitioner testified that he or she expected the
Falcon to appreciate in value, and, in fact, petitioners
ultimately sold the Falcon for less than the price at which they
had purchased it.  Although Mr. Rabinowitz did suggest that the
negative publicity regarding the safety of the Falcon depressed
the value of the aircraft, petitioners did not indicate that they
expected the Falcon to appreciate in value, nor that they
considered the possibility that the jet might appreciate in value
when they decided to begin the jet charter activity.  This factor
therefore does not support petitioners' contention that they
operated the jet charter activity for profit.

5.    The Success of the Taxpayer in Carrying On Other
      Similar or Dissimilar Activities

We next examine the success of petitioners in carrying on
other similar or dissimilar activities.  If a taxpayer has
previously engaged in similar activities and made them
profitable, this success may show that the taxpayer has a profit
objective, even though the current activity is presently

unprofitable.  Sec. 1.183-2(b)(5), Income Tax Regs.  A taxpayer's success in other, unrelated activities also may indicate a profit objective.  See Daugherty v. Commissioner, T.C. Memo. 1983-188 (taxpayer's diligence, initiative, foresight, and other qualities that generally lead to success in other business activities indicate taxpayer had a profit motive for activity at issue).

Petitioners are both extremely successful individuals. Petitioners grew CFI, the company they founded, into an organization with over $300 million in sales at its peak.  As majority owners of CFI, petitioners were responsible for overseeing every aspect of the business, including marketing, design, coordinating production, employee relations, and numerous other activities.  Petitioners also have been engaged in several other businesses.  For example, Mr. Rabinowitz was involved in a movie business with Ms. Harrah.  At the time of trial, petitioners co-owned a women's apparel design and import firm called Studio CL.  The fact that petitioners grew CFI into such a large organization and have considerable experience in various business endeavors is evidence of petitioners' ample business experience and skills they brought to their jet charter activity. See id.  This factor favors finding petitioners operated the jet charter activity for profit.

6.  The Taxpayer's History of Income or Loss With Respect to the Activity

We next examine petitioners' history of income or loss with respect to the jet charter activity.  A history of substantial losses may indicate that the taxpayer did not conduct the

activity for profit. <u>Golanty v. Commissioner</u>, 72 T.C. 411, 427 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(b)(6), Income Tax Regs. Losses during the initial or startup stage of an activity do not necessarily indicate, however, that the taxpayer did not conduct the activity for profit, but losses that continue to be sustained beyond the period that customarily is necessary to bring the operation to profitable status may indicate the taxpayer did not engage in the activity for profit. <u>Engdahl v. Commissioner</u>, 72 T.C. at 668; sec. 1.183-2(b)(6), Income Tax Regs. Losses due to unforeseen circumstances beyond the taxpayer's control do not negate that the taxpayer engaged in the activity for profit. Sec. 1.183-2(b)(6), Income Tax Regs.

Petitioners sustained losses from the jet charter activity each year from 1985 through 1997. Petitioners' losses during the early years of their operation could be attributed to a startup phase of the activity, but the losses continued for 12 years.

Petitioners' losses with respect to the jet charter activity generally decreased, however, almost every year during the relevant years. Further, petitioners' net cash flow with respect to the jet charter activity, although negative for each of the relevant years, showed a general trend of increasing. Mr. Rabinowitz also testified that the unforeseen safety problems with the Falcon during the relevant years and the resulting negative publicity hampered BHJ's ability to obtain third-party

charters for the jet and also required additional safety checks, which increased BHJ's expenses.

Thus, although petitioners did sustain large losses during each of the relevant years and in fact through the duration of the activity, the unforeseen circumstances were a factor in the losses petitioners encountered in the jet charter activity. Also, several indications showed that the prospects of the jet charter activity were improving over time. These circumstances partially mitigate petitioners' long history of losses from the jet charter activity.

7. The Amount of Occasional Profits, If Any, Which Are Earned

We next consider the amount of occasional profits, if any, petitioners earned from the jet charter activity. Occasional profits the taxpayer earned from the activity, in relation to the amount of losses incurred, the amount of the taxpayer's investment, and the value of the assets used in the activity provide useful criteria in determining the taxpayer's intent. Sec. 1.183-2(b)(7), Income Tax Regs. A practical possibility that a taxpayer could earn enough money in a year to exceed expenses also can indicate a profit objective. Bolt v. Commissioner, 50 T.C. 1007, 1014 (1968).

Petitioners incurred losses from the jet charter activity for each year beginning with 1985, when they began the activity, through 1997, when they ended the activity by selling the Falcon. As discussed above, there was a general trend of increasing net cash flow and decreasing losses from the jet charter activity

through the relevant years, even with the unforeseen safety problems.

Notwithstanding this trend, it is uncertain whether petitioners ever would have earned a profit from the jet charter activity because of the significant fixed costs involved. This factor does not support petitioners' contention that they engaged in the jet charter activity for profit.

8. The Financial Status of the Taxpayer

We next examine petitioners' financial status. If a taxpayer does not have substantial income or capital from sources other than the activity in question, it may indicate that the taxpayer engages in the activity for profit. Sec. 1.183-2(b)(8), Income Tax Regs. Conversely, substantial income from sources other than the activity, especially if the losses generate large tax benefits, may indicate that the taxpayer is not conducting the activity for profit. Id. Taxpayers with substantial income from other sources have a much greater tax incentive to incur large expenditures in a hobby type of business. Jackson v. Commissioner, 59 T.C. 312, 317 (1972). The fact that a taxpayer has substantial income from other sources does not, however, foreclose a profit motive if the facts and circumstances indicate a taxpayer engaged in the activity for profit. Wheeler v. Commissioner, T.C. Memo. 1999-56. It is just one factor. See id.

Petitioners had substantial income from CFI that the jet charter losses could and did offset. Petitioners reported

considerable net income during each of the relevant years.  In 1993 alone, petitioners reported $5.5 million in wages.  While this factor is not helpful to petitioners' contention, it does not foreclose a profit motive.  See id.

9.  Whether Elements of Personal Pleasure or Recreation Are Involved

We next examine whether elements of personal pleasure or recreation were involved in the activity.  The presence of recreational or pleasurable motives in conducting an activity may indicate that the taxpayer is not conducting the activity for profit.  Sec. 1.183-2(b)(9), Income Tax Regs.  The fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit, however, if the activity is, in fact, conducted for profit as shown by other factors.  Jackson v. Commissioner, supra; sec. 1.183-2(b)(9), Income Tax Regs.

Petitioners did make some personal trips in the Falcon. Petitioners and respondent do not agree on the number and value of the trips petitioners took for personal travel versus business travel.  The disagreement results in part from different views of particular trips.  For example, respondent characterized certain trips from San Diego to Los Angeles made by Jennifer Heft (petitioners' daughter and a merchandising employee of CFI) to meet with Ms. Little as personal trips, while petitioners characterized Ms. Heft's travel as business trips.  Similarly, respondent contended that petitioners' trips to Aspen, Colorado, were of a personal nature because Mr. Rabinowitz skied and

petitioners had a second home there, while petitioners stated that the Aspen trips were to visit their flagship Carole Little store to deliver or collect merchandise, check on merchandise or store appearance, and discuss CFI matters with the store staff. In any case, petitioners paid BHJ from their personal account for the occasional personal trips they took on the Falcon, and CFI paid for the trips characterized as having a business purpose.

Petitioners also often used Ms. Harrah's jet for personal travel when the Falcon was on charter or otherwise unavailable to them. CFI was the primary customer of the jet charter activity, and petitioners both testified credibly as to the business purpose and nature of the CFI trips.

We are not convinced that either petitioner was an airplane hobbyist or particularly enjoyed air travel, but we do recognize that petitioners derived some benefit from the ability to use a private jet occasionally for personal purposes. We find petitioners' use of the Falcon and the jet charter activity to be primarily motivated by the needs of their CFI business. This factor supports a conclusion that petitioners engaged in the jet charter activity for profit.

10. Conclusion

Mr. Rabinowitz testified that petitioners thought they could enter the jet charter business, do it better than other charter companies, and make money while doing it. Petitioners used their considerable business skills to attempt to make the business

profitable.  Petitioners set competitive rates for the jet charter activity, advertised the jet charter activity, and solicited business from other jet owners.  Petitioners kept voluminous books and records and maintained the FAA certificate required to sell charters to third parties.  Petitioners made modifications to their business plan to attract more charter business.  Petitioners successfully showed a general trend of decreasing losses throughout the relevant years, despite negative publicity and FAA-mandated additional safety requirements for their jet.  Most importantly, we found petitioners' testimony reliable and credible.

The nine nonexclusive factors and the facts and circumstances of this case lead us to conclude that petitioners engaged in the jet charter activity with the primary, predominant and principal purpose and intent of realizing an economic profit independent of tax savings during the relevant years.  We therefore find that petitioners have met their burden of proving the requisite motive for their jet charter activity.

Accordingly, we do not sustain respondent's determination in the notice of deficiency.

To reflect the foregoing in favor of petitioners and the concessions of the parties,

<u>Decision will be entered under Rule 155</u>.