T.C. Memo. 2016-69

UNITED STATES TAX COURT

DAVID H. HOFFMANN AND JERRILYNN HOFFMANN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 29887-12.                    Filed April 19, 2016.

        In 1999 and 2000, PH purchased interests in jet aircraft in
anticipation of leasing them profitably to E, a corporation organized
to combine his business with similar businesses.  In 2001, after E
failed, PH's majority-owned corporation reacquired the business he
had sold to E.  Thereafter, PH could no longer earn a profit from
leasing his aircraft to controlled corporations.  Ps claim that the
continuing, and increasing, losses incurred in PH's jet service activity
through 2004 did not evidence the absence of a profit motive because
the losses were attributable to E's failure and PH's inability to
terminate his relationship with the provider of his aircraft.

        <u>Held</u>:  Because PH's contracts with the provider of his aircraft
allowed him to cause it to reacquire his interests in the aircraft no
later than October 20, 2002, Ps did not establish that the losses
incurred in PH's jet service activity in 2003 and 2004 were
unavoidable or that PH engaged in his jet service activity for profit
during those years; consequently, Ps can deduct expenses of that

[*2] activity paid in each of those years only to the extent allowed by I.R.C. sec. 183(b).

Held, further, Ps' deficiency and I.R.C. sec. 6662(a) accuracy-related penalty for 2003 sustained; Ps' deficiency and I.R.C. sec. 6662(a) accuracy-related penalty for 2004 depend on computation of deductions allowable for that year related to PH's jet service activity taking into account agreed amount of unreported income for that year.

Royal B. Martin, Jr., Denis J. Conlon, and Steven Spencer Brown, for petitioners.

Angela B. Reynolds, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  Respondent determined deficiencies of $112,794 and $538,339 in petitioners' 2003 and 2004 Federal income tax, respectively, and accuracy-related penalties of $22,559 and $107,668 for those years, respectively. The parties entered into a stipulation of settled issues, and the only issues remaining for decision are (1) whether petitioners are entitled to deduct expenses related to David Hoffmann's jet service activity in excess of the gross income from that activity and (2) whether petitioners are liable for section 6662(a) accuracy-related penalties on their underpayments of tax for the years in issue.  Unless

[*3] otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all dollar amounts to the nearest dollar.

FINDINGS OF FACT

Petitioners resided in Illinois when they filed their petition in this case.

Formation of EPS

During the 1990s, Mr. Hoffmann engaged in an executive search business through his wholly owned corporation, DHR International, Inc. (Original DHR).[1] In 1998, Mr. Hoffmann pursued an opportunity to combine Original DHR's business with many service businesses throughout the country in a new corporation, Enterprise Profit Solutions (EPS), which had been organized to be the nation's largest outsourcing firm. Toward that end, Original DHR sold its assets to EPS on December 14, 1998. EPS then turned to plans for an initial public offering (IPO).

Investment bankers planning EPS' IPO encouraged Mr. Hoffmann to acquire a private jet on EPS' behalf. The bankers expected that, because of EPS' far-flung locations and, in particular, the demands of planning and executing the

---

[1]Mr. Hoffmann also conducted a separate "middle market" search business through his wholly owned subchapter S corporation, JobPlex, Inc. (JobPlex).

**[*4]** IPO, EPS would have air travel needs that could not be met conveniently by relying on commercial flights.  Lending covenants, however, prevented EPS from acquiring its own aircraft.

Mr. Hoffmann's Acquisition of Interests in Jet Aircraft

Mr. Hoffmann discussed the possibility of acquiring an interest in a jet aircraft with his friend Jeff Goldman, a pilot who had owned aircraft and profited from their appreciation.  Mr. Goldman advised Mr. Hoffmann that he, too, could expect to realize appreciation from investing in aircraft.

Mr. Hoffmann eventually decided to acquire an interest in a Citation X, then the fastest executive jet available.  On December 30, 1998, petitioners formed a limited liability company, Hoffmann Holdings, LLC (Hoffmann Holdings), of which they were the sole owners, to acquire fractional interests in aircraft. Because interests in Citation Xs were not immediately available, Hoffmann Holdings initially leased from NetJets Aviation, Inc. (NetJets), interests in two Raytheon Hawker 1000 aircraft.[2]

On October 7, 1999, Hoffmann Holdings purchased from NetJets a 12.5% interest in a Citation X (Citation 1).  On April 20, 2000, Hoffmann Holdings

_____

[2]NetJets Aviation, Inc., was the successor to Executive Jet Sales, Inc.  For ease of reference, following the parties' lead, we will refer to each of these entities, and an affiliate, Executive Jet Aviation, Inc., without distinction as NetJets.

**[*5]** purchased from NetJets a 6.25% interest in a second Citation X aircraft (Citation 2).

The purchase agreements for both Citation 1 and Citation 2 allowed Hoffmann Holdings to cause NetJets to repurchase its interests in the aircraft after 30 months for the lesser of the original purchase price or the then fair market value of the interest. They prohibited Hoffmann Holdings from transferring its interests in the aircraft to a third party without NetJets' consent. NetJets could withhold consent to any proposed transfer at its discretion unless, among other things, the third-party transferee agreed to the terms of the agreements under which NetJets operated the aircraft on behalf of its coowners. The management agreements governing the use of the aircraft required Hoffmann Holdings to pay fixed monthly management fees as well as additional charges for actual use of the aircraft. Each management agreement had a general five-year term but would terminate earlier upon exercise of the repurchase option.

The Aircraft Lease Between Hoffmann Holdings and Original DHR

On the advice of tax attorney Frank Bastian, Hoffmann Holdings entered into an aircraft lease with Original DHR to demonstrate Hoffmann Holdings' profit motive. A signed copy of the lease introduced into evidence is dated November 18, 1998, and the parties have stipulated that Original DHR and Hoffmann

[*6] Holdings entered into the lease on that date, even though they also stipulated that Hoffmann Holdings was not created until December 30, 1998. A letter from Mr. Bastian dated August 3, 2000, enclosed a proposed written agreement that purportedly incorporated the terms of a prior oral contract. In that letter, Mr. Bastian professed unconcern that the agreement predated Hoffmann Holdings' formation. In his view, Mr. Hoffmann entered into the agreement on behalf of Hoffmann Holdings before its formation.

The written lease allowed Original DHR to use "two Cessna Citation X aircraft on an 'as needed' basis." The lease provided for "a term of three years commencing November 1, 1998 and ending October 31, 2001."

The Failure of EPS' IPO

Financial difficulties prevented EPS from completing its planned IPO. In response to those difficulties, EPS' board removed its initial chief executive officer and replaced him with Mr. Hoffmann. Mr. Hoffmann's efforts, however, proved unsuccessful, and EPS ultimately sold its various businesses back to their original owners. In particular, on February 6, 2001, Hoffmann Acquisition Corp. (Hoffmann Acquisition) acquired Original DHR's assets from EPS. The acquiring corporation then changed its name to DHR International, Inc. (DHR). Mr. Hoffmann owned 75% of the DHR stock.

**[\*7]** After DHR acquired Original DHR's assets, Hoffmann Holdings did not invoice DHR for its use of Hoffmann Holdings' aircraft and failed to formalize its arrangement with DHR in a written lease.

Mr. Hoffmann's Initial Attempt To Unwind His Deal With NetJets

In a letter to David Beach of NetJets dated April 26, 2000, Mr. Hoffmann purported to exercise his "right" to have NetJets repurchase Hoffmann Holdings' interests in Citation 1 and Citation 2.[3] Mr. Hoffmann hired an attorney named Anthony Barone, whom Mr. Hoffmann described as having "a certain degree of experience", to negotiate with NetJets.

Although NetJets was apparently willing to repurchase all of Hoffmann Holdings' aircraft at Mr. Hoffmann's request (even though the repurchase options granted to Hoffmann Holdings had not yet become exercisable), Mr. Hoffmann decided to retain at least one of the Citations.[4] Internal DHR correspondence

---

[3]As of the date of Mr. Hoffmann's letter, Hoffmann Holdings had no apparent right to cause NetJets to repurchase its interest in either Citation 1 or Citation 2 because Hoffmann Holdings had not yet held either aircraft for 30 months. (In fact, Mr. Hoffmann's letter was dated just six days after Hoffmann Holdings acquired its interest in Citation 2.)

[4]An email dated November 16, 2004, from Dianne Mahaffey of NetJets to Donn Seidholz, also of NetJets, states: "In June of 2000 NetJets was going to repurchase all shares Owned by Hoffman[n] Holdings." Ms. Mahaffey continues:

(continued...)

[*8] suggests that the decision to keep Citation 2 was motivated by the need to deal with Hoffmann Holdings' use of its aircraft in excess of the hours allotted to its interests in them. If Hoffmann Holdings had sold all of its aircraft back to NetJets, it would have had to pay for the "over flown hours".[5] Cathleen Lloyd, DHR's chief financial officer, estimated that it would be less expensive to keep Citation 2 and absorb the over flown hours through the continued payment of monthly management fees without further use of the aircraft. Ms. Lloyd determined that the over flown hours, all of which were allocated to the contract for Citation 2, would be fully absorbed by April 20, 2002.

The Conduct of Mr. Hoffmann's Jet Service Activity During the Years in Issue

During 2003 and 2004, DHR used Citation 2 "for certain business activity". By 2003, however, it had become clear that Mr. Hoffmann could not earn a profit

---

[4](...continued)
"What I can gather from correspondence was that 908QS [Citation 2] would not be sold back but assigned to David H. Hoffman[n]".

[5]At trial, Cathleen Lloyd, DHR's chief financial officer, acknowledged the repurchase options that allowed Hoffmann Holdings to resell its aircraft to NetJets but claimed that there would have been "significant penalties associated with those options", apparently referring to the obligation to pay for over flown hours.

[*9] from the business use of his aircraft.[6]  According to Ms. Lloyd's testimony, DHR reimbursed Mr. Hoffmann for the direct costs of its use of the aircraft and an allocable portion of NetJets' monthly management fee but did not pay Mr. Hoffmann enough to generate a profit.  During that period, Ms. Lloyd, Gloria Seghi, DHR's chief administrative officer, and Adam Morrison, DHR's controller, assisted Mr. Hoffmann in recordkeeping, allocating flight costs on the basis of his instructions.  When asked to describe his duties in regard to his jet service activity, Mr. Hoffmann referred only to his responsibility for approving proposed uses of the aircraft.

On November 18, 2004, Mr. Hoffmann traded in his interest in Citation 2 for a 6.25% interest in a Gulfstream 200 aircraft.  As part of the exchange, he received a trade-in allowance from NetJets of $812,563 towards the $1,123,440 purchase price of the Gulfstream 200.

Less than four months after acquiring his interest in the Gulfstream 200, Mr. Hoffmann advised NetJets of his decision to cancel his contract for that aircraft. In his letter to NetJets, Mr. Hoffmann referred to repeated difficulties scheduling

---

[6]Mr. Hoffmann apparently succeeded to Hoffmann Holdings' ownership interest in Citation 2 on May 31, 2001, when the Illinois secretary of state dissolved Hoffmann Holdings because of its failure to file an annual report for 2000.  Formal documentation with NetJets of the transfer of ownership, however, was not completed until June 23, 2003.

**[\*10]** flights at the times and from the departure locations he preferred. He acknowledged that he used the plane "mostly for flights in and out of Eagle/Vail", where petitioners had a vacation home. Mr. Hoffmann complained to NetJets of having to call guests and change arrangements for babysitting and travel to the airport. These scheduling difficulties, he alleged, "create[] more problems than the plane is worth."

In response to Mr. Hoffmann's request, NetJets agreed to repurchase the Gulfstream 200. Thereafter, DHR met its air travel needs without resort to a private jet.

Petitioners' Tax Reporting of Mr. Hoffmann's Jet Service Activity

For the first four years of Mr. Hoffmann's jet service activity, petitioners reported the following amounts on Schedules C, Profit or Loss From Business, of their Forms 1040, U.S. Individual Income Tax Return:[7]

---

[7]On those Schedules C, as well as on Schedules C attached to their 2003 and 2004 Forms 1040, petitioners reported a jet service business with the name Hoffmann Holdings LLC, owned by Mr. Hoffmann. Hoffmann Holdings purchased the Citation 1 in October 1999 and purchased the Citation 2 in April 2000. The Illinois secretary of state dissolved Hoffmann Holdings in May 2001. The parties have stipulated, and we have found, that Hoffmann Holdings was solely owned by petitioners. We assume that Hoffmann Holdings was classified as a partnership for Federal tax purposes. See sec. 301.7701-3(b)(1), Proced. & Admin. Regs. For 1999 through at least part of 2001, petitioners should therefore have reported their distributive shares of its income, deductions, and the like on

(continued...)

| [*11] | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|
| Gross receipts | $800,935 | $760,229 | $124,391 | -0- |
| Depreciation | 150,357 | 155,000 | 265,714 | $189,796 |
| Loan prepayment charge | -0- | 153,196 | -0- | -0- |
| Other expenses | 761,417 | 739,885 | 101,589 | 166,610 |
| Loss | (110,839) | (287,852) | (242,912) | (356,406) |

For the years in issue, petitioners reported the following amounts on the Schedules C for Mr. Hoffmann's jet service activity:

| | 2003 | 2004 |
|---|---|---|
| Gross receipts | $35,978 | $78,061 |
| Depreciation | 135,569 | 398,801 |
| Mortgage interest | 91,890 | 81,887 |
| Legal & professional | -0- | 4,851 |
| Repairs and maintenance | 107,481 | 111,507 |
| Other expenses | 218,082 | 254,791 |
| Loss | (517,044) | (773,776) |

On their 2003 Federal income tax return, petitioners reported adjusted gross income of $179,787 after claiming a $517,044 loss deduction from Mr.

---

[7](...continued)
Schedule E, Supplemental Income and Loss. The error appears to be one of form and not one of substance.

[*12] Hoffmann's jet service activity. For 2004, they reported adjusted gross income of $2,980,944 after claiming a $773,776 loss deduction from that activity. Petitioners relied on others to prepare their tax returns.

Petitioners' Unreported Income

Mr. Hoffmann received a payment of $115,726 from DHR in 2004 in reimbursement of repair and maintenance expenses attributable to his aircraft that petitioners failed to include in the income reported on their 2004 Federal income tax return. The parties stipulated that Mr. Hoffmann deducted the expenses relating to the $115,726 payment on the 2004 Schedule C for his jet service activity.[8]

Tax Advice Received by Petitioners

The record fails to disclose in detail any advice petitioners received regarding the deductibility of the expenses incurred in Mr. Hoffmann's jet service activity. Edward Ruberry, EPS' outside general counsel, Ms. Lloyd, and Mr. Hoffmann all testified that tax attorney Frank Bastian gave advice in regard to Mr.

---

[8]The total amount reported as repair and maintenance expense on the 2004 Schedule C for Mr. Hoffmann's jet service activity, however, was only $111,507, which the parties stipulated to have been paid by JobPlex.

[*13] Hoffmann's aircraft.[9] Neither Mr. Ruberry nor Ms. Lloyd described the content of Mr. Bastian's advice. Mr. Hoffmann claimed that Mr. Bastian had told him that he "could claim a deduction for * * * [his] use of the jets". He admitted, however, that he did not remember what, specifically, Mr. Bastian had told him. The only evidence of the specific content of any advice provided by Mr. Bastian's firm is a letter from one of his partners that explains the rules relating to the imputation of income from an employee's use of an employer-provided aircraft.

The Notice of Deficiency

Respondent's notice of deficiency (notice) disallowed in full the deductions for depreciation, mortgage interest, and repair and maintenance expenses claimed by petitioners in each of the years in issue in regard to Mr. Hoffmann's jet service activity. In addition, the notice disallowed in each year the amount of "other expenses" claimed by petitioners in excess of the gross income they reported from the jet service activity. The notice also disallowed petitioners' deduction for 2004 of legal and professional fees related to that activity and increased petitioners' income for that year by the $115,726 reimbursement of repair and maintenance

---

[9]Ms. Lloyd denied that she provided any tax advice herself regarding Mr. Hoffmann's jet service activity.

[*14] expenses that Mr. Hoffmann received from DHR. Petitioners have conceded the other adjustments made in the notice.

Mr. Hoffmann's Testimony

Mr. Hoffmann testified that he intended to make a profit from his jet service activity. He admitted, however, that he "wasn't astute on the recordkeeping" involved in allocating costs between business and personal use of his aircraft. He viewed any such allocation as "irrelevant". Because he "owned all the company",[10] he said, "it really didn't seem to make much difference to me."[11]

Mr. Hoffmann claimed not to have read the provision in each of the purchase agreements between NetJets and Hoffmann Holdings providing the latter's repurchase option. He acknowledged that his understanding of his rights under the agreement was based on "an assumption" rather than familiarity with the terms of the agreement.

---

[10]In fact, Mr. Hoffmann owned only 75% of the DHR stock. The record does not identify the owners of the remaining 25% of DHR stock or their relationship to Mr. Hoffmann.

[11]Mr. Hoffmann's testimony on the importance of distinguishing between business and personal uses of his aircraft, however, was inconsistent. Upon questioning by the Court, he professed concern that DHR's minority shareholders not bear the cost of his personal use of the aircraft.

**[\*15]** In addition, Mr. Hoffmann was unable to explain the calculation of the amounts reported on the 2003 and 2004 Schedules C for his jet service activity. When asked by respondent's counsel about the derivation of the figures, he repeatedly professed not to know. He could not even identify the property in regard to which depreciation had been claimed, saying he had "no idea."

<u>Petitioners' Substantiation of the Claimed Deductions</u>

Petitioners failed to provide substantiating documents requested by respondent's counsel until after the trial had ended. On April 21, 2014, three days after completion of the trial, petitioners moved for leave to supplement the record. On May 27, 2014, the parties submitted a supplemental stipulation of facts that largely addressed substantiation issues.[12] Thereafter, petitioners withdrew their motion.

OPINION

I.    <u>The Deductibility of Losses From the Jet Service Activity</u>

Respondent offers two rationales in support of his claim that petitioners cannot deduct the losses they reported from Mr. Hoffmann's jet service activity in

---

[12]The supplemental stipulation does not fully address the $218,082 of "other expenses" claimed on the 2003 Schedule C for Mr. Hoffmann's jet service activity. The parties stipulated $150,798 of other expenses paid by JobPlex and $10,780 of other expenses paid by DHR, leaving unsubstantiated $56,504 ($218,082 – $150,798 – $10,780).

**[*16]** 2003 and 2004.  First, respondent argues the mortgage interest and repair and maintenance expenses for which petitioners claimed deductions were actually paid by JobPlex.  Respondent also argues that the "other expenses" for which petitioners claimed deductions were either paid by JobPlex or DHR or were unsubstantiated.  Therefore, respondent argues that petitioners failed to establish that they paid the mortgage interest, repair and maintenance, and other expenses for which they claimed deductions.  Second, respondent argues that Mr. Hoffmann did not engage in his jet service activity for profit.

We agree with respondent that Mr. Hoffmann did not conduct his jet service activity for profit during the years in issue.  Because the deductions disallowed in each year as a consequence of that determination exceed the amount that would be disallowed by acceptance of respondent's first argument, we need not address that argument.

A.    Burden of Proof

In general, a taxpayer bears the burden of proof.  Rule 142(a)(1).  However, section 7491(a) shifts the burden of proof to the Commissioner in certain situations if the taxpayer raises the issue, introduces credible evidence with respect to any factual issue relevant to ascertaining the proper tax liability, complies with all substantiation requirements, maintains required records, and cooperates with

[*17] reasonable requests of the Internal Revenue Service "for witnesses, information, documents, meetings, and interviews".

Petitioners claim to have met the requirements to shift the burden of proof to respondent under section 7491(a). Respondent denies that claim, noting, among other things, petitioners' failure to provide requested substantiating documents until after the trial ended, their failure to fully substantiate all claimed deductions despite their submission of additional evidence after trial, and the lack of credibility of several of petitioners' witnesses as demonstrated by the inconsistency of that testimony with documentary evidence.

We agree with respondent that petitioners failed to prove that they meet the conditions specified in section 7491(a) to shift the burden of proof. In any event, our assignment of the burden of proof would not affect our disposition of the case because, for the reasons explained below, we find on a preponderance of the evidence that, during the years in issue, Mr. Hoffmann did not engage in his jet service activity for profit. See, e.g., Estate of Black v. Commissioner, 133 T.C. 340, 359 (2009); Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005).

[*18] B. Section 183 For-Profit Requirement

  1. Introduction

Section 183(a) provides: "In the case of an activity engaged in by an individual * * *, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." In general, section 183(b) allows deductions attributable to an activity not engaged in for profit only to the extent of the gross income from the activity. Section 183(c) provides: "For purposes of this section, the term 'activity not engaged in for profit' means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Section 162 applies to trade or business expenses, while section 212(1) and (2) allows a deduction, respectively, for expenses incurred "for the production or collection of income" and for the management, conservation, or maintenance of income-producing property.

Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of nine factors to be considered when ascertaining a taxpayer's profit intent. Those factors are: (1) the manner in which the taxpayer carries on the activity, (2) the expertise of the taxpayer or his advisors, (3) the time and effort expended by the taxpayer in carrying on the activity, (4) the expectation that assets used in the activity may

**[\*19]** appreciate in value, (5) the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or losses from the activity, (7) the amount of occasional profits, if any, earned by the taxpayer, (8) the taxpayer's financial status, and (9) elements of personal pleasure or recreation. No single factor is conclusive, and we may accord certain factors greater weight than others. See Golanty v. Commissioner, 72 T.C. 411, 426 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981); Schlievert v. Commissioner, T.C. Memo. 2013-239, at \*18.

Although Mr. Hoffmann testified that he intended to make a profit from his jet service activity, we give more weight to the objective factors listed above in determining whether he had the requisite profit objective and less to his "mere statement of intent." See Keanini v. Commissioner, 94 T.C. 41, 46 (1990); Judah v. Commissioner, T.C. Memo. 2015-243, at \*32; see also sec. 1.183-2(a), Income Tax Regs.

On the basis of the record as a whole, taking into account the factors listed in section 1.183-2(b), Income Tax Regs., we conclude that Mr. Hoffmann did not engage in his jet service activity for profit during the years before us, and we so find.

**[*20]**     2.     Application of the Profit Factors

As explained below, each of the nine factors listed in the regulations supports respondent's position.

a.     Manner of Carrying On Activity

The taxpayer's conduct of an activity in a businesslike manner may indicate that the taxpayer is profit motivated.  Sec. 1.183-2(b)(1), Income Tax Regs.  To make this determination, we can look to whether the taxpayer maintains complete and accurate books and records, whether the activity is carried on in a manner similar to other activities of the same nature that are profitable, and whether the taxpayer has changed operating methods or abandoned unprofitable methods "in a manner consistent with an intent to improve profitability".  Id.

The parties agree that Mr. Hoffmann initially carried out the jet service activity in a businesslike manner but disagree on whether he continued to do so during the years in issue.  Respondent observes that, after DHR acquired the assets of Original DHR in February 2001, Hoffmann Holdings did not invoice DHR for its use of the aircraft and failed to formalize its arrangement with DHR in a written

[*21] lease.[13]  Further, Mr. Hoffmann admitted that he "wasn't astute on the recordkeeping" involved in allocating costs between business and personal use of his aircraft.

Petitioners attribute the failure to issue invoices to DHR for its use of the aircraft to the close relationship between Mr. Hoffmann and the corporation. Petitioners do not specifically address the absence of a formal lease agreement with DHR concerning its use of Mr. Hoffmann's aircraft, but they suggest that, by the years in issue, Mr. Hoffmann no longer viewed a written lease as important. Petitioners note that Mr. Hoffmann's "focus in the years 2003 and 2004 was to mitigate * * * losses" that they claim were unavoidable "because * * * [Mr. Hoffmann] was locked into the NetJets contracts for five years, [and] he was unable to extricate himself from that commitment".[14]  According to Ms. Lloyd,

[13]Even if Original DHR's rights and obligations under its lease agreement with Hoffmann Holdings transferred to EPS upon the latter's acquisition of Original DHR's assets on December 14, 1998, and then transferred to Hoffmann Acquisition upon its acquisition of those assets from EPS on February 6, 2001, the lease would have expired by its terms on October 31, 2001.  Petitioners provided no evidence that, after DHR's acquisition of the assets of Original DHR, Hoffmann Holdings or Mr. Hoffmann sought to extend the initial lease or enter into a new aircraft lease with DHR.

[14]Petitioners offered no explanation of why, if Mr. Hoffmann's focus in 2003 and 2004 was mitigating losses, he traded in Citation 2 on November 18, 2004, for a more expensive aircraft.

**[\*22]** Original DHR and Hoffmann Holdings executed their lease on the advice of tax attorney Frank Bastian to demonstrate Hoffmann Holdings' profit motive in acquiring and leasing the aircraft. Once Mr. Hoffmann's focus shifted from earning profits to mitigating losses, he apparently no longer viewed the existence of a formal lease agreement as critical.

In assessing the manner in which Mr. Hoffmann carried on his jet service activity, we find more important than any defects of recordkeeping his willingness to incur avoidable losses. Just as abandoning unprofitable methods can indicate a profit motive, sec. 1.183-2(b)(1), Income Tax Regs., a continuing and unexplained failure to abandon an unprofitable activity evidences motives other than pursuit of profit, see Heinbockel v. Commissioner, T.C. Memo. 2013-125, at \*23-\*24 (finding that jet leasing activity that continued after inability to earn profit became clear was not conducted in a businesslike manner); Daugherty v. Commissioner, T.C. Memo. 1983-188, 1983 Tax Ct. Memo LEXIS 602, at \*20 ("[A]t some point \* \* \* [continued] losses \* \* \* might justify a conclusion that \* \* \* [the taxpayer] abandoned any possible profit motive.").

The evidence refutes Mr. Hoffmann's contention that his commitment to NetJets forced on him losses that he could only mitigate but not avoid altogether. The purchase agreements with NetJets, which Mr. Hoffmann acknowledged he

**[*23]** had not read, allowed Hoffmann Holdings to cause NetJets to repurchase Hoffmann Holdings' interest in the aircraft after 30 months. Although the management agreements each provided for a general five-year term, each would terminate earlier upon exercise of the repurchase option. Moreover, NetJets' conduct suggests that it would not have strictly enforced the 30-month condition on the repurchase option. NetJets was apparently willing to purchase both Citation 1 and Citation 2 at Mr. Hoffmann's request in June 2000 and may actually have purchased Citation 1 at that time.[15] In addition, in response to Mr. Hoffmann's request, NetJets agreed to repurchase the Gulfstream 200 just five months after he acquired it by trading in Citation 2. In any event, even if NetJets had insisted on strictly enforcing the 30-month condition to the repurchase option,

---

[15]The statement by Dianne Mahaffey of NetJets in her email of November 16, 2004, that NetJets would not repurchase Citation 2 implies that it did repurchase Citation 1 at Mr. Hoffmann's request. The application to the contract for Citation 2 of the over flown hours incurred on Citation 1 is consistent with that proposition. In addition, the parties submitted formal documentation of the transfer of ownership of Citation 2 to Mr. Hoffmann after the dissolution of Hoffmann Holdings on May 31, 2001, but introduced no such documentation in regard to Citation 1. Finally, the loan prepayment charge of $153,196 reported on the 2000 Schedule C for Mr. Hoffmann's jet service activity could be explained by Hoffmann Holdings' early repayment of the loan it incurred to purchase Citation 1 after reselling that aircraft to NetJets.

[*24] Mr. Hoffmann could have caused NetJets to repurchase Citation 2 any time after October 20, 2002.[16]

On the basis of Mr. Hoffmann's lax recordkeeping and, more importantly, his willingness to incur substantial avoidable losses, we find that he did not carry on his jet service activity in a businesslike manner during the years in issue.

### b. Expertise of the Taxpayer or His Advisors

Preparation for an activity by extensive study or consultation with experts may indicate a profit motive when the taxpayer carries on the activity as advised. Sec. 1.183-2(b)(2), Income Tax Regs.

Petitioners claim that Mr. Hoffmann "gathered information from those experienced in the air transportation business" and that "studies were conducted". They introduced no studies into evidence, however, and failed to describe the content of any studies Mr. Hoffmann received. Petitioners claim that Mr. Hoffmann sought counsel from Edward Ruberry, Anthony Barone, Jeff Goldman, Frank Bastian, and unidentified members of Mr. Bastian's firm. There is no

---

[16]Cathleen Lloyd acknowledged the possibility of reselling the aircraft to NetJets but claimed that there would have been "significant penalties associated with those options", apparently referring to the obligation to pay for over flown hours. But her analysis determined that the over flown hours would be fully absorbed by the payment of monthly management fees to NetJets through April 20, 2002. There is no evidence that exercise of the repurchase option for Citation 2 after April 20, 2002, would have resulted in any penalty.

[*25] evidence, however, that any of these individuals had significant experience in or particular expertise regarding the business of providing jet transportation services.[17] Mr. Hoffmann's professed "team of advisers", Ms. Lloyd, Gloria Seghi, and Adam Morrison, were employees of or service providers to DHR who reported to Mr. Hoffmann and assisted him in recordkeeping, allocating flight costs on the basis of his instructions. Petitioners presented no evidence that any member of that team offered advice regarding the jet service business or was qualified to do so.

More to the point, the advice Mr. Hoffmann claims to have received would not address the critical inquiry in this case. Our concern is not why Mr. Hoffmann began his jet service activity in 1999 but why he continued it during 2003 and

---

[17]Mr. Hoffmann described his friend Mr. Goldman as a pilot and aircraft owner. The record does not disclose, however, whether Mr. Goldman used his aircraft in conducting a business or for personal purposes. Cf. Hillman v. Commissioner, T.C. Memo. 1999-255, 1999 WL 558568, at *8 ("Expertise with respect to the breeding and showing of horses is to be distinguished from expertise in the economics of these undertakings."). According to Mr. Hoffmann, Mr. Goldman had "experienced appreciation" in his own aircraft and advised Mr. Hoffmann that he, too, could "expect to have some appreciation in the aircraft." It does not appear, however, that any advice provided by Mr. Goldman to Mr. Hoffmann regarding the potential of realizing a profit from appreciation took into account the specific terms of the contracts with NetJets.
Mr. Hoffmann characterized Mr. Barone as having "a certain degree of experience" but offered no further description of any expertise Mr. Barone had regarding the jet service business or any advice he received from Mr. Barone.

[*26] 2004 when it had become clear that the activity could not be conducted profitably. As noted above, petitioners defend Mr. Hoffmann's continuation of his jet service activity during the years in issue not on the basis of advice from experts but instead on his alleged inability to divest himself of his aircraft and terminate his relationship with NetJets. Again, the evidence before us refutes petitioners' claims that Mr. Hoffmann was "locked into" his relationship with NetJets throughout the years in issue and thus forced to suffer losses that he could only mitigate but not avoid.

On the basis of Mr. Hoffmann's failure to present evidence of advice received from persons knowledgeable regarding the jet transportation business, we conclude that this factor, to the extent it is relevant to the issue before us, favors respondent.

        c.    <u>Time and Effort Expended by the Taxpayer in Carrying On the Activity</u>

The time and effort expended by the taxpayer in carrying on the activity may indicate whether the taxpayer had a profit motive with respect to the activity, particularly if there are no substantial personal or recreational elements associated with it. Sec. 1.183-2(b)(3), Income Tax Regs.

**[*27]** In their discussion of this factor in their briefs, petitioners focus primarily on Mr. Hoffmann's efforts regarding EPS' planned IPO and the winding down of EPS' business after the IPO failed. They argue that "the EPS business and the jet service business should be considered together." But we need not address the issue of whether Mr. Hoffmann's efforts on behalf of EPS and the leasing of his aircraft comprise a single activity for purposes of section 183 because his involvement with EPS ended before the years in issue.[18] Therefore, the time Mr. Hoffmann devoted to EPS, however extensive, does not support the proposition that he conducted his jet service activity during the years before us with the objective of making a profit.

The record does not indicate how much time Mr. Hoffmann devoted to his jet service activity during the years in issue. When asked to describe his duties in regard to that activity, he referred only to his responsibility for approving proposed uses of the aircraft. More generally, petitioners concede that Mr. Hoffmann's focus during those years was mitigating losses. While petitioners claim that the continuing losses Mr. Hoffmann incurred in his jet service activity were unavoidable because of his inability to extricate himself from his obligations

---

[18]There is no evidence that Mr. Hoffmann had any continuing involvement with EPS after Hoffmann Acquisition repurchased the assets of Original DHR from EPS on February 6, 2001.

**[*28]** to NetJets, we have found otherwise. Efforts directed at mitigating avoidable losses do not demonstrate an objective of making a profit.

We conclude that this factor, as well, favors respondent.

### d. Expectation That Assets Used in Activity May Appreciate

An expectation that assets used in the activity will appreciate in value may indicate a profit objective. See sec. 1.183-2(b)(4), Income Tax Regs. A profit motive may be inferred in the absence of operating profits if reasonably expected appreciation in the value of the assets used in the activity could exceed the operating expenses. See id. The appreciation in value must be sufficient, however, to recoup the accumulated losses of prior years. See Golanty v. Commissioner, 72 T.C. at 427-428; Hillman v. Commissioner, T.C. Memo. 1999-255, 1999 WL 558568, at *8.

Petitioners argue that "Mr. Hoffmann was advised by knowledgeable individuals that jet aircraft often appreciate in value." But the unremarkable prospect that some aircraft appreciate would not establish that it was reasonable for Mr. Hoffmann to expect appreciation in the undivided interests he held, along with other coowners, in aircraft operated by NetJets.

[*29] Petitioners introduced no evidence of an established market in undivided interests in NetJets aircraft. As a practical matter, an owner's only realistic means of selling its interest in the aircraft might well have been through exercise of the repurchase option.

Unless Mr. Hoffmann found a third-party transferee acceptable to NetJets, he could have sold his interest in the aircraft only to NetJets, pursuant to the repurchase option, at a price no greater than the original purchase price of the interest paid by Hoffmann Holdings. In that case, the only profit he could have earned would have reflected the recovery of prior depreciation.[19] Because the losses reported by Mr. Hoffmann from his jet service activity exceeded the depreciation claimed on the aircraft used in that activity--his losses were economic losses and not mere "paper" losses--resale of the aircraft at a price no greater than the original purchase price would not have recouped those losses.

Petitioners also refer to possible appreciation in the value of EPS stock held by Mr. Hoffmann. Cf. Campbell v. Commissioner, 868 F.2d 833, 836-837 (6th Cir. 1989) (taking into account shareholders' expectation of profit from

---

[19]Because the allowance Mr. Hoffmann received when he traded in Citation 2 for a Gulfstream 200 did not exceed the $1,085,000 original purchase price of Mr. Hoffmann's interest in Citation 2, any gain he may have realized on the disposition of the plane would merely have recouped part, but not all, of the depreciation previously claimed.

[*30] corporation in finding that their leasing of an aircraft to the corporation was also entered into for profit), aff'g in part, rev'g in part T.C. Memo. 1986-569. Once again, petitioners' focus is misdirected. For starters, we find no evidence in the record that Mr. Hoffmann owned stock in EPS.[20] Moreover, an expectation of profit from the EPS venture might have been a factor in Mr. Hoffmann's decision to begin the jet service activity in 1999, but EPS failed before the years in issue. Any expectation of profit from EPS cannot justify Mr. Hoffmann's continued conduct of the jet service activity after EPS' failure.

The absence of a reasonable expectation of appreciation sufficient to recoup prior losses favors respondent in the sense that it eliminates a factor that might explain the demonstrated string of losses that Mr. Hoffmann incurred in his jet service activity.

e.      Success of the Taxpayer in Carrying On Other Similar or Dissimilar Activities

Section 1.183-2(b)(5), Income Tax Regs., provides that a taxpayer's prior success in converting similar activities from unprofitable to profitable enterprises

---

[20]Although Edward Ruberry and Mr. Hoffmann himself testified to his role as an officer of EPS, neither of them described any ownership interest he had in the corporation.

**[*31]** "may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable."

Petitioners point to Mr. Hoffmann's success in other ventures as evidence that he had a profit motive in pursuing the jet service activity.  Respondent acknowledges Mr. Hoffmann's success in other ventures but argues that those ventures are dissimilar to his jet service activity.

We agree with respondent that, because of the dissimilarities between the various activities, Mr. Hoffmann's success in unrelated ventures deserves little weight in assessing whether he carried out his jet service activity during the years in issue with the objective of earning a profit.  This factor favors respondent in the sense that it eliminates a claim that the losses Mr. Hoffmann incurred in his jet service activity might be anomalous given his success in related activities.  Cf. McMillan v. Commissioner, T.C. Memo. 2015-109, at *21.

f.    Taxpayer's History of Income or Losses With Respect to the Activity

A record of substantial losses over several years after the startup period of an activity, if not explainable as due to customary business risks or reverses, may indicate the absence of a profit motive.  Sec. 1.183-2(b)(6), Income Tax Regs.

[*32] Mr. Hoffmann never reported a profit from his jet service activity. Petitioners observe that the activity produced positive cashflow during its first three years[21] and that the continuing (and increasing) losses thereafter were attributable to the failure of EPS' IPO. The losses incurred in Mr. Hoffmann's jet service activity in 2003 and 2004, petitioners claim, "were a by-product or aftermath" of "the attempted IPO for EPS." Again, petitioners invoke Mr. Hoffmann's alleged inability to "extricate himself from the commitments he had made to NetJets". We have already explained how the evidence refutes this claim and demonstrates that Mr. Hoffmann could have caused NetJets to repurchase Citation 2 at any time after October 20, 2002.

The regulations provide that incurring losses from an activity "because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer" does not indicate that the activity is not engaged in for profit. Id. The unforeseen failure of EPS may explain the losses incurred in the jet service activity through 2002 but not the continuation of those losses in 2003 and 2004. As

---

[21]The accuracy of this observation requires disregarding the loan prepayment charge reported on the 2000 Schedule C for Mr. Hoffmann's jet service activity. Although petitioners do not explain this charge, it could be evidence that Mr. Hoffmann succeeded in selling Citation 1 back to NetJets in 2000, despite petitioners' claims that he was "locked into" a five-year deal. See supra note 15.

**[*33]** explained below, the evidence before us convinces us that Mr. Hoffmann's retention of his interest in Citation 2 during the years in issue--and, indeed, his trading up to a more expensive aircraft in November 2004--reflected his judgment that the personal conveniences of travel by private jet, and perhaps the expected tax benefits of using losses from his jet service activity to offset petitioners' substantial income, justified the costs of maintaining his ownership of the aircraft, at least until scheduling difficulties with NetJets greatly reduced those personal conveniences.

g.    Amount of Occasional Profits, If Any, Which Are Earned

Section 1.183-2(b)(7), Income Tax Regs., provides:

The amount of profits in relation to the amount of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the taxpayer's intent. An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit. * * *

Conversely, substantial profits, even if only occasional, may indicate a profit motive when the investment or losses are relatively small. Id. Finally, "an opportunity to earn a substantial ultimate profit in a highly speculative venture is

**[*34]** ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated." Id.

Again, Mr. Hoffmann never reported a profit from his jet service activity. In regard to this factor, petitioners offer essentially the same arguments they make in regard to the prior factor: Mr. Hoffmann's jet service activity initially generated positive cashflow, even if not a profit, and the potential profit that Mr. Hoffmann could have earned from EPS' IPO supports finding a profit objective for his conduct of the jet service activity. Again, neither point addresses the critical question of why Mr. Hoffmann continued the jet service activity after the failure of EPS' IPO. According to Ms. Lloyd's testimony, DHR did not pay Mr. Hoffmann enough for its use of his aircraft to generate a profit. Therefore, as petitioners' concede, "once EPS ceased being a customer, Hoffmann had no real opportunity to charter the aircraft profitably."

On the basis of Mr. Hoffmann's failure to report even occasional profits from his jet service activity and his adherence to a course of conduct during the years at issue that offered no possibility of earning a profit, we conclude that this factor favors respondent.

**[*35]**          h.          Financial Status of the Taxpayer

Section 1.183-2(b)(8), Income Tax Regs., provides: "Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved." See also Sullivan v. Commissioner, T.C. Memo. 1998-367, 1998 WL 712432, at *13, aff'd, 202 F.3d 264 (5th Cir. 1999).

Petitioners acknowledge that they had substantial income from sources other than Mr. Hoffmann's jet service activity and that the losses they claimed from that activity reduced their taxable income. They seek to minimize the adverse impact of this factor by claiming that "any personal or recreational elements involved in Mr. Hoffmann's * * * [jet service activity] were de minimis".

Contrary to petitioners' argument, for the reasons explained below, we find that considerations of personal convenience played a significant role in Mr. Hoffmann's decision to retain his interest in Citation 2 during the years in issue. Petitioners claim that Mr. Hoffmann's "business savvy would most certainly not let him intentionally throw away money just because he may be able to recover a portion of it through tax deductions." We accept that Mr. Hoffmann was too savvy a businessperson to throw money away intentionally. His retained

**[*36]** ownership of Citation 2 after the failure of EPS' IPO and beyond the lapse of the condition on his legal right to cause NetJets to repurchase the aircraft suggests that he judged the pleasure and convenience of traveling by private jet rather than on commercial flights worth the cost. We find it plausible that, in making that calculation, Mr. Hoffmann took into account the tax savings he expected to achieve from deducting at least part of the cost of maintaining his aircraft.

We conclude that this factor also favors respondent.

### i. Elements of Personal Pleasure or Recreation

Section 1.183-2(b)(9), Income Tax Regs., provides: "The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved." The existence of some "purposes or motivations other than solely to make a profit", however, does not prevent an activity from being treated as engaged in for profit. Id.

Air travel by private jet rather than on a commercial flight, even in the case of travel for business reasons, involves elements of personal consumption. The availability of a private jet frees travelers from the strictures of commercial carriers' schedules and thus offers significant convenience. Depending on the

[*37] particular aircraft, a private jet may also offer more pleasurable accommodations to the traveler.

Petitioners ignore these realities in arguing that Mr. Hoffmann did not seek personal pleasure or recreation in carrying out his jet service activity but instead "was consumed with the business exigencies regarding the EPS IPO and the subsequent liquidation and resolution of the business affairs."[22] More to the point, petitioners focus again on Mr. Hoffmann's motivations in commencing the activity rather than on the reasons he continued the activity during the years in issue.

The increasing losses Mr. Hoffmann incurred in his jet service activity after EPS' demise show that DHR's needs for jet travel services were insufficient to support the profitable conduct of that activity. DHR could meet its air travel needs without resort to a private jet, as it in fact did after Mr. Hoffmann canceled his contract with NetJets for the Gulfstream 200. Therefore, we infer that Mr.

---

[22]Petitioners claim that Mr. Hoffmann "conscientiously attempted to make sure that no personal charges were assumed as part of the ordinary and necessary business expenses being incurred." We find this claim inconsistent with Mr. Hoffmann's inability to explain the calculation of the amounts reported on the 2003 and 2004 Schedules C for his jet service activity. Despite petitioners' reliance on others to prepare their tax returns, if Mr. Hoffmann had made conscientious efforts to prevent the deduction of personal expenses, he ought to have been able to describe at least the general method used in determining the amounts deducted.

**[*38]** Hoffmann continued his jet service activity during the years in issue for reasons of personal convenience.

Our inference is further supported by the reasons Mr. Hoffmann gave for canceling the Gulfstream 200 contract. Mr. Hoffmann canceled the contract for the Gulfstream 200, and thereby terminated his jet service activity, only when he found that the personal convenience of travel by private jet no longer justified the cost. From that we conclude that Mr. Hoffmann continued the activity after the failure of EPS and throughout the years in issue primarily for reasons of personal convenience and not for the purpose of making a profit. This factor, too, favors respondent.

### 3.    Weighing the Factors

Because each of the nine factors listed in section 1.183-2(b), Income Tax Regs., supports respondent's position, we have no need to weigh some factors against others. Although the specified factors are nonexclusive, the record does not present any other factors that would weigh against those listed in the regulations. We therefore find that, during 2003 and 2004, Mr. Hoffmann did not carry on his jet service activity to make a profit. Consequently, petitioners are entitled to deductions attributable to that activity only to the extent allowed by section 183(b).

[*39] II.    Petitioners' Unreported Income

Petitioners do not dispute respondent's increase in their gross income for 2004 to reflect DHR's reimbursement of $115,726 of repair and maintenance expenses Mr. Hoffmann incurred.  Petitioners argue, however, that the increase in petitioners' income should result in a corresponding increase in the deductions allowable from that activity under section 183(b).  Respondent's disallowance of the deductions claimed on the 2004 Schedule C for the jet service activity in excess of the $78,061 of gross income reported on that schedule conflicts with his determination that petitioners understated their income from that activity by $115,726.  Therefore, we agree with petitioners that the increase in the income from Mr. Hoffmann's jet service activity for 2004 should result in a corresponding increase in the deductions allowed in respect of that activity, thereby reducing the amount of their deficiency.

III.    Accuracy-Related Penalties

Section 6662(a) and (b)(1) provides for an accuracy-related penalty of 20% of the portion of an underpayment of tax attributable to negligence or disregard of rules and regulations.  Section 6662(a) and (b)(2) provides for the same penalty on the portion of an underpayment of tax attributable to "[a]ny substantial understatement of income tax."  Section 6662(d)(2)(A) defines the term

[*40] "understatement" as the excess of the tax required to be shown on the return over the amount shown on the return as filed. In the case of an individual, an understatement is "substantial" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). An understatement is reduced, however, by the portion attributable to the treatment of an item for which the taxpayer had "substantial authority". Sec. 6662(d)(2)(B)(i). Section 6664(c)(1) provides an exception to the imposition of the section 6662(a) accuracy-related penalty if it is shown that there was a reasonable cause for the underpayment and the taxpayer acted in good faith.

### A. Petitioners' Arguments

Petitioners do not dispute that the deficiencies respondent determined exceed the arithmetic threshold for "substantial" understatements. We have already determined, however, that respondent overstated petitioners' deficiency for their 2004 taxable year by failing to increase the allowable deductions from Mr. Hoffmann's jet service activity to reflect the unreported income attributable to the repair and maintenance expenses reimbursed by DHR. Whether petitioners' deficiency for 2004 meets the arithmetic threshold for a substantial understatement after correction of respondent's error is a computational matter.

**[*41]** Petitioners argue that, even if the disallowance of deductions attributable to Mr. Hoffmann's jet service activity results in a deficiency for each of 2003 and 2004 in excess of 10% of the tax they were required to show on their return for that year, the disallowance of those deductions does not give rise to, or increase, a substantial understatement because they had substantial authority to claim those deductions. Petitioners also argue that "[t]he legal advice provided to Petitioner by his seasoned attorneys and other advisors, to whom sufficient information was presented, constitutes reasonable cause on his behalf" with regard to the accuracy-related penalties respondent determined.[23]

B.     Substantial Authority

The determination of substantial authority requires a weighing of the authorities that support the taxpayer's treatment of an item against the contrary authorities. Sec. 1.6662-4(d)(3)(i), Income Tax Regs. A taxpayer can have substantial authority for a position that is unlikely to prevail, as long as the weight of the authorities in support of the taxpayer's position is substantial in relation to

---

[23]Petitioners make no argument that they had substantial authority for their treatment of the items they conceded before trial. Moreover, the only legal advice they referred to in support of their claim to reasonable cause related to their deduction of expenses attributable to Mr. Hoffmann's jet service activity. Therefore, petitioners concede that "application of the penalties for the other adjustments in the notice of deficiency which have been settled will be computational."

**[\*42]** the weight of any contrary authorities. See id. subpara. (2) (substantial authority standard is less stringent than the more likely than not standard). Section 1.6662-4(d)(3)(ii), Income Tax Regs., describes the required weighing as follows:

> The weight accorded an authority depends on its relevance and persuasiveness, and the type of document providing the authority. For example, a case or revenue ruling having some facts in common with the tax treatment at issue is not particularly relevant if the authority is materially distinguishable on its facts, or is otherwise inapplicable to the tax treatment at issue.

After weighing the relevant authorities as required by the regulations, we conclude that petitioners lacked substantial authority for claiming deductions from Mr. Hoffmann's jet service activity in excess of the income generated by the activity. Petitioners have not cited any authority that allows deductions in excess of income from an activity continued by a taxpayer without reasonable explanation when the activity no longer offers a realistic possibility of earning a profit. By contrast, as previously noted, a taxpayer's continuation of an activity in those circumstances demonstrates the absence of a profit motive. See Heinbockel v. Commissioner, at \*23-\*24; Daugherty v. Commissioner, 1983 Tax Ct. Memo LEXIS 602, at \*20.

Petitioners cite Cornfeld v. Commissioner, 797 F.2d 1049 (D.C. Cir. 1986), rev'g T.C. Memo. 1984-105, Pryor v. Commissioner, T.C. Memo. 1991-109, and

[*43] <u>Rabinowitz v. Commissioner</u>, T.C. Memo. 2005-188, 2005 WL 1763776, for the proposition that losses attributable to unforeseeable changes in circumstances do not preclude finding a profit motive.  Each of those cases is readily distinguishable from Mr. Hoffmann's situation.  In contrast to Mr. Hoffmann, the taxpayer in <u>Cornfeld</u> promptly abandoned his aircraft leasing project after the event that called into question his ability to earn a profit from the project.[24]  During the years at issue in <u>Pryor</u>, the taxpayer's sailboat chartering activity remained in its startup phase.  The record before us in that case did not establish that the taxpayer's activity could not be conducted profitably in the future.  In <u>Rabinowitz v. Commissioner</u>, 2005 WL 1763776, at *13, despite unforeseen safety problems with the model of aircraft the taxpayers used in their jet charter activity, the resulting losses "generally decreased" and the taxpayers' net cashflow from the activity "showed a general trend of increasing."  The activity's improving prospects "partially mitigate[d]" the taxpayers' "long history

---

[24]Although we inferred a lack of a profit motive from the taxpayer's prompt abandonment of his project, <u>Cornfeld v. Commissioner</u>, T.C. Memo. 1984-105, 1984 Tax Ct. Memo LEXIS 569, at *13 ("[Taxpayer's] abandonment of the [jet leasing] project so soon after his ouster from IOS strongly suggests that he actually believed he would have no use for the jet if he were not associated with IOS."), <u>rev'd</u>, 797 F.2d 1049 (D.C. Cir. 1986), the Court of Appeals for the D.C. Circuit disagreed.  <u>Cornfeld v. Commissioner</u>, 797 F.2d at 1053 ("We fail to see how * * * [the taxpayer's abandonment of the project] establishes the absence of an honest profit objective.").

[*44] of losses". Id. at *14. By contrast, petitioners failed to demonstrate improving prospects for Mr. Hoffmann's jet service activity during the years in issue. In fact, as noted above, petitioners concede that, after EPS' failure, Mr. Hoffmann "had no real opportunity to charter the aircraft profitably." In short, each of the authorities cited by petitioners is either "materially distinguishable on its facts, or is otherwise inapplicable to the tax treatment at issue." Cf. sec. 1.6662-4(d)(3)(ii), Income Tax Regs. Consequently, those authorities are not "particularly relevant". See id.

Because petitioners lacked substantial authority for claiming deductions from Mr. Hoffmann's jet service activity in excess of the income the activity generated, petitioners' understatements are not reduced by section 6662(d)(2)(B)(i). Therefore, petitioners had a substantial understatement of income tax for their 2003 taxable year. Whether they also had a substantial understatement for 2004 raises a computational issue to be resolved by correction for respondent's failure to allow additional deductions from Mr. Hoffmann's jet service activity in that year because of the agreed amount of unreported income.

C.    Negligence

Because we find that the portion of petitioners' underpayment in each of the years in issue attributable to the deductions claimed in respect of Mr. Hoffmann's

[*45] jet service activity in excess of the amounts allowed by section 183(b) was attributable to negligence, the section 6662(a) accuracy-related penalty applies to that portion of the underpayment in each year regardless of whether it results in or increases a substantial understatement within the meaning of section 6662(d)(1)(A).[25]

Section 1.6662-3(b)(1), Income Tax Regs., provides that "negligence" includes a "failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return." See also Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967) ("Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances."), aff'g in part and remanding in part 43 T.C. 168 (1964), and T.C. Memo. 1964-299. A "failure * * * to keep adequate books and records or to substantiate items properly" also constitutes negligence. Sec. 1.6662-3(b)(1), Income Tax Regs.

---

[25]Respondent's arguments in regard to petitioners' negligence relate solely to their treatment of the expenses of Mr. Hoffmann's jet service activity. Therefore, to the extent that respondent has not conceded the application of the negligence penalty of sec. 6662(a) and (b)(1) to that portion of petitioners' underpayment for 2004 attributable to respondent's other adjustments, we conclude that respondent has not met his burden of production under sec. 7491(c) of establishing the appropriateness of that portion of the negligence penalty. Cf. Higbee v. Commissioner, 116 T.C. 438, 446 (2001).

**[\*46]** Taking a "return position that has a reasonable basis" is not negligent.  Id. Section 1.6662-3(b)(3), Income Tax Regs., however, provides:  "Reasonable basis is a relatively high standard of tax reporting".  Whether a position satisfies the reasonable basis standard depends on the extent to which it is supported by authorities of the type relevant in determining substantial authority, "taking into account the relevance and persuasiveness of the authorities, and subsequent developments".  Id.  A position that "is reasonably based on one or more of * * * [those] authorities * * * will generally satisfy the reasonable basis standard even though it may not satisfy the substantial authority standard".  Id.

Petitioners' position that Mr. Hoffmann had a profit motive in conducting his jet service activity during the years at issue despite his acknowledged inability to earn a profit rests on Mr. Hoffmann's unwarranted assumption regarding his rights vis-a-vis NetJets.  According to petitioners, the losses incurred from the activity during those years were unavoidable because Mr. Hoffmann was "locked into" his relationship with NetJets.  Mr. Hoffmann acknowledged, however, that his belief in that regard was based on an assumption.  He confessed not to have read the relevant documents.  Moreover, his misunderstanding of his rights demonstrates that he failed to seek the advice of a competent attorney regarding the terms of those documents.

**[\*47]** A reasonable and ordinarily prudent person would read those documents relevant to the propriety of deductions claimed on that person's tax return or at least seek an explanation from legal counsel of what those documents provide. Mr. Hoffmann's failure to do either thus constituted negligence.  See Marcello v. Commissioner, 380 F.2d at 506; sec. 1.6662-3(b)(1), Income Tax Regs.  His acknowledged laxity in  recordkeeping and inability to explain the amounts reported on the Schedules C for his jet service activity also show that he failed to make a reasonable attempt to comply with the tax law and did not exercise ordinary and reasonable care in reviewing those schedules.  See sec. 1.6662-3(b)(1), Income Tax Regs.; cf. Marcello v. Commissioner, 380 F.2d at 507 ("[A] failure to keep books and documents necessary to form a rational basis for the income reported and the expenses deducted [evidences negligence].").

We have already concluded that the authorities petitioners relied on to support their position that Mr. Hoffmann engaged in his jet service activity for profit despite the absence of profit potential are "materially distinguishable" and thus "not particularly relevant".  Cf. sec. 1.6662-4(d)(3)(ii), Income Tax Regs.  For the same reason, we conclude that those authorities do not provide a reasonable basis for petitioners' deduction of expenses incurred in that activity in excess of the amounts allowed by section 183(b).  Therefore, the strength of petitioners'

[*48] legal position does not prevent a finding of negligence based on Mr. Hoffmann's lack of due care.

### D.     Reasonable Cause and Good Faith

As noted above, petitioners argue that they had reasonable cause for deducting expenses in excess of income from Mr. Hoffmann's jet service activity and acted in good faith in doing so on the basis of legal advice provided by Mr. Hoffmann's "seasoned attorneys and other advisors".

A taxpayer's reliance on the professional advice of an attorney or accountant may constitute reasonable cause and good faith.  As a general rule, "[t]he determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances."  Sec. 1.6664-4(b)(1), Income Tax Regs.  In making that determination, the "most important factor" is usually "the extent of the taxpayer's effort to assess the taxpayer's proper tax liability."  Id.  Reliance on the advice of a professional tax adviser may constitute reasonable cause and good faith "if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith."  Id.

We have already concluded that Mr. Hoffmann failed to make a reasonable effort to determine his proper tax liabilities.  The evidence introduced provides no

**[*49]** grounds to excuse Mr. Hoffmann's negligence on the basis of advice he received from qualified advisers.  Petitioners presented no evidence regarding the substance of any advice Mr. Hoffmann received in support of the deductions in issue.  Thus, petitioners failed to demonstrate that they reasonably and in good faith relied on the advice of a professional tax adviser.  Because petitioners have not shown reasonable cause for the portion of their underpayment attributable to Mr. Hoffmann's jet service activity, section 6664(c)(1) does not preclude the imposition of the accuracy-related penalty on that portion of their underpayment.

IV.   Conclusion

For the reasons explained above, we find that Mr. Hoffmann did not engage in his jet service activity for profit during the years before us.  Consequently, petitioners are entitled to deductions attributable to that activity only to the extent allowed by section 183(b).  Petitioners' income from that activity should include the $115,726 Mr. Hoffmann received from DHR in 2004 in reimbursement of repair and maintenance expenses, and that income should be taken into account in determining the deductions allowable under section 183(b).

We also conclude that petitioners lacked substantial authority for claiming deductions from Mr. Hoffmann's jet service activity in excess of the income the activity generated.  Therefore, for the purpose of determining petitioners' liability

**[\*50]** for accuracy-related penalties under section 6662(a) for the years in issue, their understatements for those years are not reduced by section 6662(d)(2)(B)(i).

We also find that the portion of petitioners' underpayment for each of the years in issue attributable to the deductions claimed in respect of Mr. Hoffmann's jet service activity in excess of the amounts allowed by section 183(b) was attributable to negligence and that petitioners failed to show reasonable cause for that portion of the underpayment for each year.

On the basis of those findings and conclusions, we sustain the deficiency and accuracy-related penalty determined by respondent for petitioners' 2003 tax year. The amounts of petitioners' deficiency and accuracy-related penalty for their 2004 tax year depend on the correction of respondent's error in failing to take into account petitioners' unreported income for that year in determining the amount of deductions allowable under section 183(b) in respect of Mr. Hoffmann's jet service activity.

<u>Decision will be entered under</u>

<u>Rule 155</u>.